## L.R. 103.6(b) "Identification of Amendments" Copy

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT~~BALTIMORE~~ DIVISION**


| | |
|---|---|
| **LOUIS M. LUPO**<br>**545 Elmcroft Blvd., Apt 10213**<br>**Rockville, Maryland 20850**<br>**Montgomery County** | : <br> : <br> : <br> : |
| **PLAINTIFF,** | : ~~Civil Action No.:~~<br> : <u>Case No.: 8:14-cv-00475-DKC</u> |
| **vs.** | : |
| **JPMORGAN CHASE BANK, N.A.**<br>**270 Park Avenue**<br>**New York, New York 10017** | : <u>**JURY TRIAL DEMANDED**</u><br> : <br> : |
| **Registered Agent:**<br>**The Corporation Trust Incorp.**<br>**351 West Camden Street**<br>**Baltimore, MD 21201** | : <br> : <br> : <br> : |
| **AND** | : <br> : |
| **SPECIALIZED LOAN SERVICING, LLC**<br>**8742 Lucent Blvd., Suite 300**<br>**Highlands Ranch, Colorado 80129** | : <br> : <br> : |
| **Registered Agent:**<br>**Capitol Corporate Services, Inc.**<br>**3206 Tower Oaks Blvd., 4th Floor**<br>**Rockville, MD 20852** | : <br> : <br> : <br> : |
| **DEFENDANTS.** | : |

## VERIFIED AMENDED COMPLAINT

### I. INTRODUCTION

AND NOW COMES Plaintiff Louis M. Lupo and files this complaint and in support alleges the following upon information and belief.

## II. PARTIES

1. Plaintiff is an adult residents of Maryland whose current address is 545 Elmcroft Boulevard, Apt. 10213, Rockville, Maryland 20850, which is located in Montgomery County, Maryland.

2. Plaintiff is employed as a senior engineer with the federal contracting sector of Computer Sciences Corporation.

3. Since 2011, Plaintiff's employer has stationed Plaintiff to federal agencies within the D.C. Metropolitan area, which is understood as encompassing the State of Maryland and part of Northern Virginia.

4. Plaintiff's professional occupation requires his continuous presence in the D.C. Metropolitan area.

5. Since 2011, Plaintiff has lived in Montgomery County, Maryland.

6. Plaintiff Lupo pays and files his taxes in Montgomery County, State of Maryland;

7. At all relevant times, the unlawful actions alleged below took place in the State of Maryland.

8. All correspondence referenced below and mailed/or faxed by Plaintiff was mailed/faxed from Montgomery County, Maryland.

9. All correspondence referenced below and mailed by Defendants Chase and SLS was mailed to Plaintiff's current residence in Rockville, Montgomery County, Maryland.

10. All telephone calls referenced below and made by Plaintiff were made using his cell telephone within the DC Metropolitan Area, most commonly Montgomery County, Maryland.

11. All telephone calls reference below and made by Defendants were made to Plaintiff in the DC Metropolitan Area, most commonly Montgomery County, Maryland.

12.2. Defendant JPMorgan Chase Bank, N.A., (hereinafter "Chase") is a federally chartered national banking association, and the originator and the mortgage servicer of the mortgage loan described below with its principal place of business at 270 Park Avenue, New York, New York 10017. At all relevant times herein, Defendant was doing business in the State of Maryland.

13.3. Defendant Specialized Loan Servicing, LLC (hereinafter "SLS") represents itself on its website as is a mortgage servicing corporation and represented itself as a servicer of the mortgage loan described below with its principal place of business at 8742 Lucent

Blvd., Suite 300, Highlands Ranch, Colorado 80129. At all relevant times herein, Defendant was doing business in the State of Maryland.

14.  Defendant SLS is a division and/or subagent of Defendant Chase.

154.  Any allegations about acts of any corporate or other business Defendant means that the corporation or other business did the alleged acts through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of her authority.

16,5.  At all relevant times, each Defendant committed acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint; additionally, some of the Defendants acted as the agent for other Defendants, and all of the Defendants acted within the scope of her agency as if acting as the agent of another.

176.  Knowing or realizing that other Defendants were engaging in or planning to engage in unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts.

187.  Each Defendant intended to and did encourage, facilitate, or assist, or conspire in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

198.  All Defendants engaged in continuous and multiple unfair and deceptive trade practices, fraud and misrepresentations that affected interstate commerce and proximately caused the herein injuries to the Plaintiff.

209.  All Defendants intentionally or recklessly adopted internal enterprise-wide software processes that encourage, facilitate, or assist in such unfair and deceptive trade practices, fraud and misrepresentations, including designing, implementing, and executing software processes that would resist and/or prohibit resolution of Defendant Chase's servicing errors but rather were calculated to escalate the servicing errors to the ultimate benefit of Defendants Chase and SLS.

21.  All Defendants acted with intent as their business model incentivizes default based upon escrow miscalculations, as through the default process the Defendants generate additional fees, high late charges, legal fees, and the management fees for foreclosure and further provides opportunities for up-selling through refinancing or repackaging of a mortgage loan.

22.  All Defendants have demonstrated implacable intransigence to working this problem through with the Plaintiff in spite of the clear proof that Defendant Chase initiated these grievous servicing errors and having initiated them, refuses to acknowledge or correct them.

2310.  All Defendants are governed by the Real Estate Settlement Procedures Act ("RESPA"), as RESPA applies to "federally related" mortgage loans that are secured by a

lien on residential real estate designated principally for the occupancy of from one to four families; the the term "federally related" refers to loans made by any lender whose deposits or accounts are insured by any agency of the federal government, loans that are intended to be sold to any of the Government Servicing Entities, and loans made by any creditor who makes or invests in residential real estate loans aggregating more than $1,000,000 per year. Plaintiff Lupo's mortgage loan is "federally related."

24<del>11</del>.  Plaintiff's letters described below to Defendants Chase and SLS fall within the definition of <del>qualify as</del> "qualified written requests" (QWR) within the meaning of RESPA, 12 U.S. § 2605(e)(1)(B) as .—a<del>A</del>t all times, the Plaintiff included his name and relevant mortgage account number, stated the reasons he believed the account was in error, and detailed the reasons why, including attaching the documentation showing how the mortgage lender's account was in error.

<del>12</del>25.  At all times Plaintiff informed the Defendants that his employment would be adversely affected by errors in his mortgage account payment history as reflected on his credit report.

26.  At all times the Plaintiff Lupo paid his Chase mortgage loan through ACH (automated clearing house) transactions through his bank directly to Defendant Chase.

27.  At all times relevant to the action herein and while Defendant Chase serviced the Plaintiff's mortgage loan there were significant discrepancies between Defendant Chase's online electronic customer payment system and Defendant Chase's online electronic customer escrow system and the mortgage account statement Plaintiff received through the U.S. Postal Service.

### III. JURISDICTION AND VENUE

28<del>13</del>.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. The action is between citizens of different states and the amount in controversy exceeds $75,000.00.

29<del>14</del>.  The Court has original and subject matter jurisdiction under 28 U.S.C. § 1331, 12 U.S.C. § 2614 (Real Estate Settlement Procedures Act, "RESPA"); 15 U.S.C. § 1692 *et seq*. (Fair Debt Collection Practices Act) and over the state statutory and common law violations <del>of Maryland law.</del>  pursuant to 28 U.S.C. § 1367(a).

30<del>15</del>.  Venue is proper in this Judicial District as the claimed violations occurred in this district.

### IV. STATEMENT OF FACTS

31<del>16</del>.  On December 20, 2007, a 30-year fixed rate promissory note (hereinafter referred to as the "Note") of $173,850 at a 6.00% annual interest rate for monthly installments of

$1,551.24 payable to the lender JPMorgan Chase Bank, N.A. was presented to Plaintiff Louis M. Lupo (hereinafter referred to as "Plaintiff") on Plaintiffs' home located at 7908 Hunter Lane,  North Richland Hills, Texas, 76180. The Note is attached hereto and incorporated herein and marked "Exhibit A."

32. By its terms, the above Note was a uniform interstate form document.

33~~17~~.  On December 20, 2007, Plaintiff also executed a Deed of Trust (hereinafter referred to as "DOT~~Mortgage~~"). The DOT~~Mortgage~~ is attached hereto and incorporated herein and marked "Exhibit B."

34~~18~~.  The DOT~~Mortgage~~ specifies, in Section 2, that "all payments accepted and applied by the Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amount due under Section 3."

35~~19~~.  The DOT~~Mortgage~~ by its terms provides that Section 3 amounts are "Funds for Escrow Items."

36.  The DOT specifies, in Section 16, that it "shall be governed by federal law and the law of the jurisdiction in which the Property is located."

37~~20~~.  Plaintiff made timely payments in full from the inception of the mortgage loan on December 2007.

38.  Since the inception of the mortgage loan, Defendant Chase, as loan servicer, has miscalculated  and overcharged for escrow on Plaintiff Lupo's account every year.

39.  For the first four years of Plaintiff's mortgage loan account with Defendant Chase, that is, since the inception of the mortgage loan, Plaintiff Lupo has been able to correct these yearly escrow miscalculations by Defendant Chase with one telephone call.

40.  For the first four years of Plaintiff's mortgage loan account, Plaintiff was also able to find mortgage payments lost by Defendant Chase through the routing numbers he maintains for his ACH mortgage payments.

41~~21~~.  Plaintiff's employment with ~~is employed as a senior engineer with~~ the federal contracting sector of Computer Sciences Corporation requires him to hold multiple security clearances from the U.S. Department of Homeland Security. ~~and has been stationed to the Maryland area.~~

42~~22~~.  Plaintiff's required security clearances demand ~~employment requires him to hold top security clearances from the U.S. Department of Homeland Security, which require, inter alia,~~ financial integrity as reflected, *inter alia*, in Plaintiff's credit reports.

43.  Prior to the unlawful actions by Defendants, Plaintiff's credit history was perfect.

44.  During this period of time recounted below, Plaintiff was being vetted for an employment position of greater responsibility with a new client employer that required additional security clearances.

45.  Also during this period, Plaintiff Lupo was denied an increase in a credit line from an creditor with whom he had a long-standing relationship.

46~~23~~.  The Defendant Chase erroneously reported on February 9, 2013 to ~~the Plaintiff 30 days late on his~~ Equifax that Plaintiff Lupo was 30 days late on his November 30, 2012 mortgage loan payment. ~~credit report dated February 26, 2013 by reporting a missed November 30, 2012 payment.~~

47. The February 9, 2013 reporting error by Defendant Chase stated that Plaintiff was $4000.00 delinquent for the month of November 2012.

48.  Plaintiff's monthly mortgage payment, including escrow, averaged approximately $1502.00

49.  Plaintiff telephoned Defendant Chase no less than ten times following his discovery of the erroneous credit reporting.

50.  Every number that Plaintiff Lupo dialed to reach Chase Customer Service, the Chase Tax Department, or the Chase Insurance Department routed him to the loss mitigation analysts.

51.  Plaintiff Lupo spoke with different Chase Customer Service representatives on each occasion,  including two identified as Renee and Marcie.

52.  Renee and Marcie, as did every Chase Customer Service representative Plaintiff spoke with, identified themselves as "loss mitigation" analysts.

53.  Renee and Marcie were unable to respond to Plaintiff Lupo's requests that his credit report be corrected.

54.  Renee and Marcie were unable to respond to Plaintiff Lupo's requests that his escrow be recalculated.

55.  After approximately ten or more phone conversations with Chase loss mitigation analysts, Plaintiff Lupo requested that Chase no longer manage his escrow account.

56.  Several of these phone calls were initiated by Chase through auto-dialing, and the agent at the end of the line identified her/himself as from the "loss mitigation" department.

57. Plaintiff Lupo also told the "loss mitigation analysts" from Chase Customer Service that "Chase was fired" from managing his escrow account.

58. He further asked Chase Customer Service to investigate and inform him of the procedure for managing his own escrow account, that is, paying taxes and insurance directly.

59. Chase Customer Service, through its loss mitigation analysts, subsequently informed Plaintiff that the investor in the note would not permit anyone but Chase to manage Plaintiff's escrow account.

60. On more than one occasion Plaintiff Lupo was informed he could not manage his escrow account.

61. In reliance upon these statements, Plaintiff Lupo then requested that his mortgage loan be assigned to a loan servicer who could better manage his escrow account.

62. In these conversations with the loss mitigation analysts, Plaintiff Lupo was offered up-selling in the form of refinancing or repackaging options.

63. Refinancing is "up-selling" because it generates enormous fees and commissions to the Defendant Chase as well as qualifies Defendant Chase for a government incentive.

64. Plaintiff Lupo repeatedly informed Defendant Chase's loss mitigation analysts that he was not interested in refinancing or repackaging options.

65. Plaintiff Lupo subsequently learned that Freddie Mac was the investor in Plaintiff Lupo's mortgage loan, as Defendant Chase sold the note and DOT to Freddie Mac shortly after the 2007 closing.

66. Plaintiff subsequently learned that Freddie Mac still owns the note and DOT, and Freddie Mac does allow for self-management of escrow for a mortgage loan holder in Plaintiff's position (more than 20% equity).

67. The Defendant Chase, on February 14, 2013, mailed Plaintiff Lupo a letter in which it identifies itself as a debt collector in bold letters and states that his mortgage loan is past due by two months and his property "may be referred to foreclosure."

68. The February 14, 2013 letter instructed Plaintiff to contact Chase Customer Service if he had any questions.

69. On February 22, 2013, Defendant Chase mailed Plaintiff Lupo a statement that specified that his escrow payment was $978.48, nearly the same amount as his principal and interest.

70.  The sum of $978.48 for escrow represents an increase of over 150% from Plaintiff Lupo's usual escrow forecast, which averaged $460 a month.

71.  For such a figure to be plausible, Plaintiff's property value would have had to have doubled, his taxes would have had to have doubled, and insurance would have had to have doubled, none of which occurred.

72.  Plaintiff Lupo discovered that the "loss mitigation analysts" were the collection department when he queried them on what their computers showed as his payment history.

73.  Plaintiff Lupo learned that the "loss mitigation analysts" had no access to his payment history or his escrow account history, and their prior representations that they would investigate his requests were deceptive and untrue.

74.  Plaintiff Lupo learned that the only information to which the "loss mitigation analysts" had access to was the amount showing due to collections on his mortgage loan account; the analysts only had the amount due in front of them, not the loan history.

75.  When Plaintiff Lupo discovered that the people had been talking to were not telling the truth,  that is, they were not "loss mitigation analysts" but rather the collection department, and further, that they had no information or authority that would enable them to correct his credit report, to correct the escrow calculation, or to permit self-management of escrow, Plaintiff Lupo requested escalation.

76. On March 13, 2013, in a conversation with Lola, loss mitigation analyst, Chase Customer Service, in response to Plaintiff Lupo's escalation requests, he was transferred to Shannon Moss.

77. Shannon Moss was also in loss mitigation and was not supervisor or otherwise an individual with access to additional information or with additional authority to correct Plaintiff's account, that is, the "loss mitigation analysts" had no escalation process.

78~~24~~.  On March 21, 2013, the Plaintiff disputed to the credit reporting agency, Equifax, in amount and date the November 2012 delinquency reported on February 9. 2013 as a Defendant Chase creditor mistake.

79~~25~~.  On the same day, March 21, 2013, Plaintiff faxed ~~sent~~ a letter to Defendant Chase directly to the CEO's office- that included the name and account number of the Plaintiff borrower, stated the reasons the borrower believed the account in error in being reported as late, including an attachment of records showing the mortgage account was current, and set out the request for an investigation and correction of his escrow account., ~~and attached records showing the mortgage account was current.~~

80.  This letter was copied to the Consumer Financial Protection Bureau, which initiated an investigation.

81.  During this period of time, Plaintiff was being vetted for an employment position of greater responsibility that required additional security clearances.

82.  Also during this period, Plaintiff Lupo was denied an increase in a credit line from an creditor with whom he had a long-standing relationship.

83.  On or about March 21, 2013, in following up on the fax with loss mitigation, Shannon Moss, Chase Customer Service, Mr. Lupo again requested escalation and informed Shannon Moss that a fax was sitting on Jamie Dimon's desk.

84.  Plaintiff Lupo was then instructed by Shannon Moss in loss mitigation to call back.

85.  When Plaintiff Lupo followed up by calling back, Shannon Moss then gave Plaintiff Lupo the phone number for a department called "Chase Executive Services."

86.  Plaintiff Lupo then telephoned Chase Executive Services in the belief, fostered by Shannon Moss, that Chase Executive Services had the ability and authority to correct his credit report, correct his escrow account, and reconcile his mortgage loan account.

87.  On or about March 22, 2013, Plaintiff Lupo telephoned Lonnie Chubb, ext. 3400716, of Chase Executive Services (1-888-310-7995), and requested that his credit report be corrected, his escrow recalculated, and his mortgage loan account reconciled.

89.  The Chase Executive Services contact number is different from the contact number Chase gave in its monthly statements from February through April for the collections department (1-800-848-9380).

90.  Mr. Chubb, of Chase Executive Services, represented himself as a debt collector.

91.  Mr. Chubb, of Chase Executive Services, refused to correct Plaintiff's credit report, recalculate his escrow, or reconcile his mortgage loan account.

92~~26~~.  The Defendant Chase confirmed the errant credit report in amount and date per Equifax update April 5, 2013.

93~~27~~.  On April 9, 2013, Plaintiff Lupo telephoned ~~Defendant Chase, through~~ David Grace of Chase Executive Services (1-888-310-7995).

94.  Plaintiff Lupo explained the negative impact the credit reporting error was having on his employment.

95.  Plaintiff Lupo also requested the correct figure for his monthly payment, including the correct escrow calculation.

~~, by telephone conversation with Plaintiff,~~

96.  Mr. Grace represented himself as a debt collector.

97.  Mr. Grace stated that he would not repair Plaintiff's credit report until Plaintiff Lupo paid $2020.80 for his March 2013 mortgage payment.

98.  The demand for $2020.80 was for a sum that was not due and owed to the Defendant Chase.

99.  Mr. Grace refused to provide the correct figure for Plaintiff Lupo's monthly mortgage payment, stated the refusal of Defendant Chase to respond to the March 21, 2013 letter, the refusal of Defendant Chase to correct Plaintiff's credit report, and the refusal of Defendant Chase to conduct an escrow analysis and recalculation.

100~~28~~.  Defendant Chase's refusal is memorialized in a letter from the Plaintiff dated April 15, 2013 faxed to Defendant Chase, in which Plaintiff again stated name and account number as well as attaching additional documentation including proof of payment for the period~~months~~ in which he was reported as late on his credit report; Plaintiff again requested correction of his credit report and escrow recalculation. ~~and attached current records.~~

101.  On April 17, 2013, Defendant Chase mailed a letter to Plaintiff purporting to respond to Plaintiff's written requests.

102.  Although even by its own figures for estimate tax and insurance in this letter dated April 17, 2013, Defendant Chase's escrow calculation overcharged Plaintiff by approximately $400.00 a month, Defendant Chase refused to recalculate Plaintiff's escrow.

103.  In this April 17, 2013 letter, Defendant Chase further wrote that it had reversed funds applied to Plaintiff's interest and principal payment in order to apply these funds to its claimed escrow shortage.

104.  The statement of account attached to the letter dated April 17, 2013 showed that Plaintiff's mortgage loan payments were not applied to his mortgage loan when received by Defendant Chase.

105.  In this April 17, 2013 letter, Defendant Chase stated that Plaintiff Lupo's loan was now delinquent and that "We are a debt collector," which was printed in bold letters.

106.  The April 17, 2013 letter also stated that Defendant Chase was now due $4302.20 for two months payments plus late fees.

107.  The August 17, 2013 letter showed that beginning in December 2012 and continuing through May 2013, Defendant Chase charged Plaintiff Lupo's mortgage loan account a monthly fee of $14.00 entitled "Corp. Adv. - Prop. Preservation Disb."

108.  The August 17, 2013 letter also showed Defendant Chase also charged Plaintiff Lupo a late fee of $52.12 from October 2012 through March 2013.

109.  These fees were charged based on Defendant's Chase claimed escrow shortage.

110.  In this April 17, 2013 letter, Defendant Chase does not provide the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

111.  Rather, Defendant Chase refers Plaintiff to its automated telephone line, Customer Care Representatives at 800-848-9136, which routed the Plaintiff to loss mitigation, as described above in ¶ 50.

112.  Defendant Chase also refers Plaintiff to its Chase Executive Services, 888-310-7995, which Plaintiff had previously called twice for assistance and been denied help, as described above, ¶¶ 87-99.

113.  Finally, Defendant Chase also refers the Plaintiff to chase.com for further assistance.

114.  On May 4, 2013, Defendant Chase sent Plaintiff Lupo a letter stating that his mortgage loan was in default by two month's payments, and again stated "We are a debt collector," which was printed in bold black letters.

115.  The May 4, 2013 letter also requested that Plaintiff Lupo complete a tax transcript request to avoid foreclosure.

116.  The May 4, 2013 letter strongly suggested that the tax transcript request was associated with the Federal Home Affordable Modification Plan (HAMP).

117.  Defendant Chase,  in a letter dated May 7, 2013, stated that Plaintiff was past due on his mortgage loan account and stated "We are attempting to collect a debt, and any information obtained will be used for that purpose.

118.  In both letters dated May 4 and May 7, 2013, the Defendant Chase demanded and attempted to collect sums that were not in fact due.

119.  All of the above letters by Defendant Chase claiming Plaintiff was in default were also demand for payment letters.

120.  Defendant Chase continued to report the Plaintiff late on his monthly credit report, but the late charge was dragged into the future so that he was reported late several months after the fact and this pattern continued through the time period of his written requests for investigation and correction of his escrow account.

121.  On May 31, 2013, Defendant Chase mailed Plaintiff Lupo a "Notice of Assignment, Sale, or Transfer of Servicing Rights" transferring his mortgage loan to Defendant SLS effective June 17, 2013 and informing Plaintiff Lupo that Defendant Chase would no longer accept payments on his mortgage loan.

122.  Plaintiff Lupo believed at the time that this transfer was in response to his request for a loan servicer who could better manage his escrow account, as described above in ¶ 61.

29.  By letter dated June 1, 2013, Defendant Chase communicated in writing its refusal to respond to the Plaintiff's written request.

12330.  Through June 2013, Defendant Chase had accepted Plaintiff's mortgage payments; Plaintiff's ACH records and Defendant Chase's online electronic customer payment system and Defendant Chase's online electronic customer escrow systemmortgage banking statement showed the account paid on time and no escrow shortage in full through this month.

124.  Plaintiff Lupo relied upon the online electronic customer service payment system and Defendant Chase's online electronic customer escrow system to make his payments and to ensure there was no shortage in his escrow account.

125.  At all times during the disputed credit reporting and claimed default by Defendant Chase of Plaintiff's mortgage loan, there were significant discrepancies between Plaintiff's online electronic customer payment system and online electronic customer escrow system and the mortgage account statement Plaintiff received through the U.S. Postal Service.

126.  Further, there was no correlation between the online accounting, the paper statements mailed, and the amounts requested from Plaintiff Lupo by the Chase debt collectors over the telephone.

31.  On June 18, 2013, Defendant Chase communicated transfer of loan servicing of the Plaintiff's mortgage to Defendant SLS, a loan servicer, effective June 30, 2013.

127.  Plaintiff Lupo, for the past five years, had paid his monthly mortgage loan payments on the end of the previous month so it would arrive by the first day of the next month, the month it was due, via ACH.

128.  Plaintiff had sent his June 1, 2013 payment to Chase by June 1, 2013, and had scheduled his July 1, 2013 payment to arrive July 1, 2013.

129.  On June 20, 2013, Defendant SLS mailed to Plaintiff Lupo a "Notice of Assignment, Sale, or Transfer of Servicing Rights" in which it stated he had become an SLS customer effective June 17, 2013, that Defendant Chase would accept no payments after June 17, 2013, and that all payments due after June 17, 2013 "should be sent to Specialized Loan Servicing."

130. Included with this notice was a demand for payment representing over one month's payment on a statement dated June 20, 2013.

131. The payment instructions were in illegible 8 point type in the right-hand corner of the payment coupon.

132. On the back of this demand for payment was a notice in ten-point type, bold, which states: "Important Messages: For your protection, please be advised that we are attempting to collect a debt and any information obtained will be used for that purpose. Calls will be monitored and recorded for quality assurance. If you do not wish for your call to be recorded, please notify the customer service associate when calling."

133. Included with the demand for payment was a separate notice entitled "Important Payment Options for Your Records"

134. The options for payment available on this "Payment Options" notice is illegible, being printed in very small type (approximately 3-point type), prompting Plaintiff Lupo to call the SLS Customer Care telephone number.

13532. On or about June 24, 2013, Plaintiff contacted the new servicer SLS by telephone at its Customer Care telephone number (800-315-4757) to make his ACH payment on his mortgage loan for the July payment.

136. The individual who answered the Customer Care telephone number, Portia, badge No. 04401, identified herself a debt collector, notified Plaintiff Lupo his mortgage loan was in default, and explained the SLS would not accept his ACH payment.

137. Plaintiff Lupo, believing that SLS operated at arms-length from Chase and was a legitimate loan servicer, explained that the payment history sent to SLS by Chase was inaccurate and requested that SLS investigate and accept his ACH payment.

138. The SLS representative, Portia, represented that if his mortgage loan account was current, SLS would accept his ACH payment.

139. Plaintiff Lupo called several times before the due date of his July payment for updates on the investigation so he could submit his ACH payment to make the July payment on time; in his conversations with Portia he stressed the importance of receiving an answer before the due date so he could maintain the positive credit reporting history key to his employment.

140. Plaintiff was repeatedly told by Portia that SLS was still investigating.

141. On July 1, 2013, the due date for Plaintiff's mortgage payment, Plaintiff called again and attempted to tender his monthly payment for July and was told then that SLS

could not accept Plaintiff's ACH payment because they "had the account from Chase and the account was in default."

142.  Plaintiff Lupo asked if SLS had proof of payment, would they then accept his ACH payment; Portia explained that SLS would then accept his ACH payment.

143.  In reliance upon that statement, on July 1, 2013, by fax, Plaintiff sent to SLS, to the attention of Portia, his proof of payment for the past 20 months to show the account paid on time and no escrow shortage through this month, and he requesting recalculation of the escrow so that the mortgage loan be taken out of default and he could make the July 1, 2013 payment by ACH.

~~Defendant SLS, who represented itself as a debt collector, rejected Plaintiff's ACH mortgage payment and reported the mortgage loan as delinquent.~~

~~33.  On July 1, 2013, Plaintiff sent a letter to Defendant SLS with Plaintiff's name and SLS account number stating the reasons the Plaintiff thought the account was in error, requesting an escrow recalculation, and attaching proof of timely payment through June.~~

~~34.  On July 1, 2013, Plaintiff tendered monthly payment to Defendant SLS.~~

~~35.  Defendant SLS refused to accept the July 1, 2013 tendered payment.~~

144.  On July 11, 2013, less than thirty (30) days after receiving the account from Chase, Defendant SLS mailed to Plaintiff Lupo a letter by certified mail, return-receipt requested, entitled "Notice of Default and Notice of Intent to Accelerate."

145.  This July 11, 2013 letter stated, as did most of the written communication from Defendant SLS to Plaintiff Lupo regarding his mortgage loan, in underlined, bold black letters across the top of the communication: "**THIS COMMUNICATION IS FROM A DEBT COLLECTOR.  THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**"

146.  The letter dated July 11, 2013, state that Plaintiff had failed to make his payments since April 2013 and that he was required to pay $5,510.23 by certified funds (cashier's check or money order) to Defendant SLS at either its Georgia (regular mail) or Colorado (overnight mail) address.

147~~36~~.  On August 21, 2013, Plaintiff sent a letter to Defendants Chase and SLS with his name, the mortgage account number, and supporting documentation, including additional proof of payment, protesting the refusal of the Defendant SLS~~s~~ to accept his payment in July and August, and requesting again an investigation, ~~and~~ that the mortgage account be recalculated and reconciled, and that his credit report be corrected.

148. In a letter dated September 6, 2013, Defendant SLS stated 1. that the fax dated July 1, 2013 was not a "qualified written request" under RESPA;  2. that there were no

missing payments from Plaintiff Lupo; 3. that Plaintiff Lupo was in default based upon the escrow analysis conducted by Defendant Chase; and 4. the Defendant SLS could not correct Plaintiff Lupo's credit report.

149.  The September 6, 2013 letter does not refer Plaintiff Lupo to an individual or office or department of the SLS who can provide assistance to the borrower; it refers the Plaintiff Lupo to the "Customer Care" number which, as referenced above, is the debt collection department, which lacks the authority and/or the information to reconcile his account and remove it from default status.

150.  In this letter dated September 6, 2013, Defendant SLS stated that Plaintiff Lupo's June and July payments were transferred by Defendant Chase to Defendant SLS.

151.  At no time did SLS conduct an independent or reasonable investigation of the escrow analysis upon which it claimed Plaintiff was in default, neither did it conduct an independent or reasonable investigation of the credit reporting errors.

152.  Defendant SLS mailed subsequent demands for payments along with its notice that it was a debt collector from the July 11, 2013 letter through the present.

153. On August 14, 2013, with the "This Communication is From a Debt Collector" heading described above in ¶ 145, Defendant SLS demanded payment of $1684.18 in the from of a cashier's check made payable to SLS in Colorado OR a Western Union payment of the same amount by August 28, 2013 in order to stop the foreclosure process.

154.  The August 14, 2013 letter stated that the cashier's check or Western Union payment was the first installment for a proposed "Trial Period Modification Plan."

155.  The August 14, 2013 letter also requested a copy of Plaintiff Lupo's tax transcript.

156.  The August 14, 2013 letter strongly suggested that the "Trial Period Modification Plan" was the federal Home Affordable Modification Plan (HAMP).

157.  The August 14, 2013 letter contained additional documents, printed in smaller type, that stated that  participation in the "Trial Period Modification Plan" did not guarantee no foreclosure would occur; further, participation in the "Trial Period Modification Plan" required Plaintiff Lupo to sign a document that amends the initial mortgage loan agreement by permitting Defendant SLS to, *inter alia*, charge additional fees.

158.  In response to the recurring demand for payments and statements of Defendant SLS, Plaintiff Lupo contacted several HUD-certified mortgage loan counseling centers for loss mitigation; no counselor would assist Plaintiff until he completed a loan modification application.

159. According to the State of Maryland Department of Labor, Licensing and Regulation public access website, Defendant SLS is not licensed as a "collection agency" within the State of Maryland.

160.  On December 26, 2014, based upon the erroneous credit reporting by Defendant Chase and SLS to the Department of Homeland Security, Plaintiff Lupo was placed on "Delayed for Entry to Duty" status with his new client employer.

161~~37~~.  As of January 5, 2014, Defendants Chase and SLS have failed to conduct the investigation requested by Plaintiff; further, neither Defendant has acknowledged the veracity of Defendant Chase's online electronic customer payment system and Defendant Chase's online electronic customer escrow system, which show Plaintiff not simply current and timely on principal, interest, and escrow, but with a surplus in his escrow account.~~.~~

162.  Several more of Plaintiff Lupo's credit card accounts were closed due to the erroneous credit reporting by Defendants Chase and SLS.

163~~38~~.  On January 5, 2014, the credit report accessed by the U.S. Department of Homeland Security revealed Plaintiff $15,000 delinquent on his mortgage account, erroneously reported so by Defendants Chase and SLS.

164~~39~~.  On January 6, 2014, Plaintiff's security~~eret~~ clearance was denied by the U.S. Department of Homeland Security based upon this credit report; Plaintiff Lupo was denied access to his job site with his new client employer.

165~~40~~.  On February 4, 2014, Genworth, Plaintiff's private mortgage insurance company, contacted Plaintiff by telephone regarding his mortgage loan account.

166.  Plaintiff Lupo requested that Genworth connect him directly to the "Loss Mitigation" department at Defendant SLS, rather than the debt collection department.

~~connected Plaintiff by telephone to Defendant SLS for correction of his account and a loss mitigation analyst.~~

167~~41~~.  On February 4, 2014, the individual represented as a loss mitigation analyst to Genworth, Colleen, badge number 10758, identified herself to Plaintiff Lupo as a debt collector and ~~represents herself as a debt collector to Plaintiff, Colleen, badge number 10758, and~~ notified~~s~~ Plaintiff that his home would be sold in thirty (30) days, on March 4, 2014.

168.  For loss mitigation purposes, Plaintiff was advised to first complete a tax transcript form; Colleen further represented that Plaintiff's Note and DOT had been sold to SLS.

169.  Plaintiff subsequently learned that the representations by Defendant SLS that he could not pay by ACH on his mortgage loan were false.

17042. In a letter dated February 4, 2014, Hughes, Watters & Askanase, LLP, debt
collectors, give notice that on behalf of Defendant SLS, the mortgage loan had been
accelerated and the Plaintiff's residence would~ill~ be sold on March 4, 2014 in a non-
judicial sale.

171. According to this letter dated February 4, 2014, the DOT had been transferred to
one of twenty substitute trustees located in California.

172. According to the letter dated February 4, 2014, Plaintiff's residential property was
to be sold on auction.com, an international website based in California.

173. A photograph of Plaintiff's residential property was posted on auction.com with an
opening bid date of March 4, 2014.

17443. On February 5, 2014, the credit report accessed by the U.S. Department of
Homeland Security reveals $18,500 credit delinquency erroneously reported by
Defendants Chase and SLS.

17544. On February 10, 2014, the U.S. Office of Personnel Management and the U.S.
Department of Homeland Security held a special investigation for Plaintiff's security~ret~
clearance due to the erroneous credit reporting by Defendants Chase and SLS.

17645. The Internal Revenue Service Form 1098, "Mortgage Interest Statement," mailed
to the Plaintiff by the Defendant Chase for tax year 2013 underreports Plaintiff's
mortgage payments and shows that those mortgage payments Chase acknowledges
receiving ~claims to receive~ were ~erroneously~ applied to the miscalculated escrow
shortage rather than to interest and principal as required by the terms of the Note.~Deed of~
~Trust/Mortgage~.

177. In a letter dated February 20, 2014, the Defendant SLS reported that it had charged
Plaintiff Lupo $1525 in legal fees advanced by Defendant SLS on February 18, 2014.

178. The letter dated February 20, 2014 also reported that SLS had charged Plaintiff an
$11.35 property inspection fee from August 2013 through March 2014.

179. The letter dated February 20, 2014 also reported that Defendant SLS had advanced
expenses from October 2013 through March 2014 on his account, charged a fee of $95.35
monthly for late charges "and other fees," and demanded payment of $20,562.

180. In a letter dated March 20, 2014, with the debt collector heading described above in
¶ 145, the Defendant SLS notified Plaintiff that it had charged him $1000.00 in legal fees
advanced by Defendant SLS on March 12, 2014; this letter demands payment of
$2020.80.

181.  Under any legitimate accounting system, Plaintiff currently owes approximately $160,000 on property currently valued at approximately $195,000.

182.  An inspection of the County Records for the county in which Plaintiff's residential property is located (Tarrant County, Texas) reveals that no sale or assignment of the Note and DOT from Defendant Chase to Defendant SLS is recorded.

183.  There is further no indication on any document sent to Plaintiff Lupo by Defendant SLS that the Note and DOT was assigned or sold.


## V.  STATEMENT OF CLAIMS

### COUNTS 1-4
### FAILURE TO ACKNOWLEDGE RESPA REQUEST
### 12 U.S.C. § 2605(e)(1)(A)

a.  Plaintiff incorporates the allegations above ¶¶ 23-37 as if set forth fully herein

b.  12 U.S.C. § 2605(e)(1)(A) requires mortgage loan servicers to acknowledge receipt of the RESPA Qualified Written Request ("QWR") within five (5) twenty (20) days, unless the servicer takes the action requested by the QWR prior to the expiration of the 5 20-day period.

c.  Defendants Chase and SLA failed to either acknowledge receipt or take the requested action within 5 20 days as required, thus violating 12 U.S.C. § 2605(e)(1)(A).

d.  Defendants Chase and SLS violated 12 U.S.C. § 2605(e)(1)(A) on four separate occasions, resulting in economic and non-economic damages to the Plaintiff.

### COUNTS 4-8
### FAILURE TO INVESTIGATE RESPA REQUEST
### 12 U.S.C. § 2605(e)(1)(B)(2)

a.  Plaintiff incorporates the allegations above ¶¶ 23-37 as if set forth fully herein.

b.  12 U.S.C. § 2605(e)(1)(B)(2) requires the loan servicer to conduct an investigation and respond to the borrower with twenty (20) sixty (60) days of receiving a QWR.

c.  12 U.S.C. § 2605(e)(2)(1)(B)(2) requires the servicer to respond, after investigation, in one of three ways:

        (A) make appropriate corrections in the account of the borrower, including the
        crediting of any late charges or penalties, and transmit to the borrower a written
        notification of such correction (which shall include the name and telephone

number of a representative of the servicer who can provide assistance to the borrower);

(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes— (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

(C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—(i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

~~(1) by making appropriate corrections to the borrower's account (such as crediting erroneous late charges or penalties) and transmitting to the borrower a written notification of such correction; (2) by providing the borrower with a written explanation of the reasons why the servicer believes that the borrower's account is correct; or (3) by providing a written explanation that either includes information requested by the borrower or an explanation of why the requested information is unavailable or cannot be obtained by the servicer.~~

d. Defendants Chase and SLS failed to respond to Plaintiff's QWR within 30 ~~60~~ days, failed to conduct an investigation, and failed to respond in one of the three appropriate ways, thus violating 12 U.S.C. § 2605(e)~~(1)(B)~~(2).

e. Further, in violation of 12 U.S.C. § 2605(e)~~(1)(B)~~(2), at no time did the response to the QWR contain the name and telephone number of an individual employed by, or the office or department of, the servicer who could provide assistance to the borrower.

f. Defendants Chase and SLS violated 12 U.S.C. § 2605(e)~~(1)(B)~~(2) on four separate occasions, resulting in economic and non-economic damages to the Plaintiff.

### COUNT~~S~~ 9-12
### FAILURE TO CEASE REPORTING ADVERSE CREDIT INFORMATION
### 12 U.S.C. § 2605(e)(3)

a. Plaintiff incorporates the allegations~~¶¶~~ above ~~23-37~~ as if set forth fully herein.

b. 12 U.S.C. § 2605(e)(3) provides that~~prohibits the servicer from~~ "[d]uring the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting

agency."~~providing adverse information regarding the disputed payment(s) to any~~
~~consumer reporting agency during the sixty (60) day period following the servicer's~~
~~receipt of a QWR relating to a dispute regarding the borrower's payments.~~

c. Defendants Chase and SLS continued to report adverse information regarding the
disputed payments during the course of each of Plaintiff's QWR, violating 12 U.S.C. §
2605(e)(3), and resulting in economic and non-economic damages to the Plaintiff.

~~COUNT 10~~
~~**FAILURE TO NOTIFY OF TRANSFER OF SERVICER**~~
~~**12 U.S.C. § 2605(b)**~~

~~a.  Plaintiff incorporates ¶ 31 as if set forth fully herein.~~

~~b.  12 U.S.C. § 2605(b)  provides that whenever servicing rights are transferred, the~~
~~servicer who transfers the servicing rights must send a Servicing Transfer Statement at~~
~~least fifteen (15) days prior to the effective date of the transfer showing the name and~~
~~address of the new servicer, toll-free telephone numbers, and the date the new servicer~~
~~will begin accepting payments.~~

~~c.  Defendant Chase failed to send the required notification of transfer of servicer as~~
~~required by law, violating 12 U.S.C. § 2605(b), and resulting in economic and non-~~
~~economic damages to the Plaintiff.~~

**COUNT 13**
**VIOLATION OF FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681s-2(b)(1)**

a.  Plaintiff incorporates the allegations above as if set forth fully herein.

b. Defendant Chase is a "furnisher of information" within the meaning of  15 U.S.C. §
1681s-2(b)(1).

c. Pursuant to 15. U.S.C. § 1681i(a)(2), Plaintiff Lupo disputed the accuracy of the
information supplied by Defendant Chase on his credit report to the credit reporting
agency.

d. Pursuant to 15 U.S.C. § 1681s-(2)(b)(1), and upon notice of dispute, Defendant Chase,
as a furnisher of information, had a duty to
   (A) conduct an investigation with respect to the disputed information;
   (B) review all relevant information provided by the consumer reporting agency
      pursuant to section 611(a)(2) [15 U.S.C. § 1681i(a)(2)];
   (C) report the results of the investigation to the consumer reporting agency;
   (D) if the investigation finds that the information is incomplete or inaccurate, report
      those results to all other consumer reporting agencies to which the person
      furnished the information and that compile and maintain files on consumers on a

nationwide basis; and
(E) if an item of information disputed by a consumer is found to be inaccurate or
    incomplete or cannot be verified after any reinvestigation under paragraph (1), for
    purposes of reporting to a consumer reporting agency only, as appropriate, based
    on the results of the reinvestigation promptly--
    (i) modify that item of information;
    (ii) delete that item of information; or
    (iii) permanently block the reporting of that item of information.

e.  Defendant Chase failed to conduct a reasonable investigation or otherwise comply
with the duties imposed by 15 U.S.C. § 1681s-(2)(b), violating 15 U.S.C. § 1681s-(2)(b)
and resulting in economic and non-economic harm to the Plaintiff.


## COUNT 14
## VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT (FDCPA)
## FALSE OR MISLEADING REPRESENTATIONS, 15 U.S.C. § 1692e

a.  Plaintiff incorporates the allegations above as if set forth fully herein.

b.  Defendants Chase and SLS are "debt collectors" within the meaning of 15 U.S.C. §
1692a

c. Pursuant to 15 U.S.C. § 1692e, a debt collector may not use "any false, deceptive, or
misleading representation or means in connection with the collection of any debt."

d. 15 U.S.C. § 1692e (2)(A0 prohibits the "false representation of -- the character,
amount, or legal status of any debt."

e.  Defendants Chase and SLS repeatedly and falsely represented the amount of the debt
Plaintiff owed on his mortgage loan.

f.  Defendants Chase and SLS repeatedly and falsely represented the legal status of the
debt Plaintiff owed on his mortgage loan by stating that Plaintiff was in Default.

g.  Defendants Chase and SLS repeatedly and falsely represented the legal status of the
debt Plaintiff owed by repeatedly and falsely claiming that it was accelerating Plaintiff's
debt and that Plaintiff was in foreclosure before such acceleration and foreclosure legally
occurred.

h.  Plaintiff suffered economic and non-economic damages from Defendants' violations.


## COUNT 15
## VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT (FDCPA)
## FALSE OR MISLEADING REPRESENTATIONS, 15 U.S.C. § 1692e

a.  Plaintiff incorporates the allegations above as if set forth fully herein.

b.  Defendants Chase and SLS are "debt collectors" within the meaning of 15 U.S.C. § 1692a

c. Pursuant to 15 U.S.C. § 1692e, a debt collector may not use "any false, deceptive, or misleading representation or means in connection with the collection of any debt."

d. 15 U.S.C. § 1692e(1) specifically prohibits "[t]he false representation or implication that the debt collector is vouched for, bonded by, or affiliated with the United States or any State . . . ."

e. 15 U.S.C. § 1692e(9) specifically prohibits "[t]he use or distribution of any written communication which simulates or is falsely represented to be a document authorized, issued, or approved by any court, official, or agency of the United States or any State, or which creates a false impression as to its source, authorization, or approval."

e. Defendant Chase falsely represented or created a false impression that it was affiliated with the federal HAMP program or that it was authorized, for the improper purpose of collecting income information, tax information, and other information from Plaintiff Lupo to aid it in collecting a debt, or that the information it solicited from the Plaintiff was authorized, issued, or approved by the United States government.

f.  Defendant SLS falsely represented or created a false impression that its Trial Period Modification Plan was affiliated with the federal HAMP program and/or that its Trial Period Modification Plan was authorized, issued, or approved by the United States government.

f.  Plaintiff suffered economic and non-economic damages from Defendant Chase's and SLS's  violations of the §1692e(1).

## COUNT 16
## VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT (FDCPA) FALSE OR MISLEADING REPRESENTATIONS, 15 U.S.C. § 1692e

a.  Plaintiff incorporates the allegations above as if set forth fully herein.

b.  Defendants Chase and SLS are "debt collectors" within the meaning of 15 U.S.C. § 1692a

c. Pursuant to 15 U.S.C. § 1692e, a debt collector may not use "any false, deceptive, or misleading representation or means in connection with the collection of any debt."

d. 15 U.S.C. § 1692e(10) specifically prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."

e.  Defendant Chase falsely represented that its Chase Executive Services would assist Plaintiff with the resolution of his mortgage loan debt.

f.  Defendant Chase falsely represented that its debt collectors were "loss mitigation analysts."

g. Defendant Chase falsely represented that Plaintiff could not self-manage his escrow account.

h.  Defendant SLS falsely represented that its debt collectors were "loss mitigation analysts."

i.  Defendant SLS used illegible very small type (approximately 3-point font) in its initial notice of "Important Payment Options for Your Records."

j.  The Defendant further used an illegible 8-point font on its payment coupon to communicate payment options.

k.  The use of illegible font by Defendant SLS was a deceptive means to induce the debtor to call the debt collector.

l.  The Defendant SLS falsely represented that Plaintiff could not make his mortgage loan payments by ACH.

l. The Plaintiff suffered economic and non-economic damages from Defendant Chase's and SLS's  violations of the §1692e(10).

### COUNT 17
### VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT (FDCPA)
### FALSE OR MISLEADING REPRESENTATIONS, 15 U.S.C. § 1692e

a.  Plaintiff incorporates the allegations above as if set forth fully herein.

b.  Defendant is a "debt collectors" within the meaning of 15 U.S.C. § 1692a

c. Pursuant to 15 U.S.C. § 1692e, a debt collector may not use "any false, deceptive, or misleading representation or means in connection with the collection of any debt."

d. 15 U.S.C. § 1692e(12) specifically prohibits "[t]he false representation or implication that accounts have been turned over to innocent purchasers for value."

e. Defendant Chase and Defendant SLS falsely represented or implied that Plaintiff's mortgage loan had been transferred, assigned, or sold for value for servicing, where in fact Chase had placed Plaintiff's mortgage loan in collections status and had so

transferred, assigned, or sold the mortgage loan as a defaulted loan to Defendant SLS, which Defendant SLS had accepted as a defaulted debt.

f. The Plaintiff suffered economic and non-economic damages from Defendant Chase's and SLS's violations of the §1692e(10).

## COUNT 18
## VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT (FDCPA)
## FALSE OR MISLEADING REPRESENTATIONS, 15 U.S.C. § 1692e

a. Plaintiff incorporates the allegations above if set forth fully herein.

b. Defendant is a "debt collectors" within the meaning of 15 U.S.C. § 1692a

c. Pursuant to 15 U.S.C. § 1692e, a debt collector may not use "any false, deceptive, or misleading representation or means in connection with the collection of any debt."

d. 15 U.S.C. § 1692e(8) specifically prohibits "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

e. Defendants Chase and Defendant SLS communicated credit information which they knew or should have known to be false to the credit reporting agencies and failed to communicate that the disputed debts were disputed.

f. The Plaintiff suffered economic and non-economic damages from Defendant Chase's and SLS's violations of the §1692e(8).

## COUNT 19̶1̶
## VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT (FDCPA)
## UNFAIR PRACTICES, 15 U.S.C. § 1692f

a. Plaintiff incorporates the allegations above ¶¶ 23 37 as if set forth fully herein.

b. Defendants Chase and SLS are "debt collectors" within the meaning of 15 U.S.C. § 1692a.

c. Pursuant to 15 U.S.C. § 1692f, a debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt.

d. Defendants Chase and SLS unfairly and continuously reported the Plaintiff's mortgage debt as late, knowing that the negative credit reporting information was especially coercive to the Plaintiff, and Defendant Chase unconscionably transferred the debt as delinquent sold the servicing rights to its division or subagent, Defendant SLS, who unconscionably refused to accept Plaintiff's payments, in violation of 15 U.S.C. § 1692a.

e. Defendants violation of the FDCPA resulted in economic and non-economic damages to the Plaintiff.

### COUNT 20~~12~~
### VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT
### UNFAIR PRACTICES, 15 U.S.C. § 1692f

a. Plaintiff incorporates the allegations ¶¶ ~~23-40~~ above as if set forth fully herein.

b. Defendants Chase and SLS are "debt collectors" within the meaning of 15 U.S.C. § 1692a.

c. Pursuant to 15 U.S.C. § 1692f, a debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt, specifically including "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property if there is no present right to possession of the property claimed as collateral through an enforceable security interest." 15 U.S.C. § 1692(f)(6)(A).

d. Defendant SLS, on its own or as a <u>division or</u> subagent of Chase, is in the process of effecting dispossession of Plaintiff's residential property without any present right to effect non-possession through a nonjudicial action, to wit, by an auction based upon claims that the Plaintiff owes money that he does not owe on the debt.

e. Defendants' violation of the FDCPA resulted in economic and non-economic damages to the Plaintiff.

### COUNT 21~~13~~
### BREACH OF CONTRACT

a. Plaintiff incorporates the allegations above ¶¶ ~~1-40 and ¶ 45~~ as if set forth fully herein.

b. A material term of the <u>mortgage loan Note</u> ~~Mortgage~~ provides that the Defendant Chase applies Plaintiff's payments to the interest and principal due under the mortgage loan.

c. Defendant Chase breached this material term, without cause, by accepting payments from Plaintiff but failing to apply the payments to the interest and principal of his mortgage loan.

d. Defendant Chase intentionally or recklessly adopted internal enterprise-wide software processes that encouraged, assisted, or facilitated such breach~~,~~ <u>including designing, implementing, and executing software processes that would resist and/or prohibit resolution of Defendant Chase's servicing errors but rather were calculated to escalate the servicing errors to the ultimate benefit of Defendants' Chase and it division and/or subagent SLS.</u>

e. Defendant Chase intentionally breached this material term to churn unlawful and excessive fees on Plaintiff's account for itself and for its subagent/division SLS.

fe. As a result of the Defendant Chase's breach of contract, Plaintiff has suffered economic and non-economic damages.

## COUNT 2214
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

a.  Plaintiff incorporates the allegations above¶¶ 1-40 and ¶ 45 as if set forth fully herein.

b. Defendant Chase owed Plaintiff a duty of good faith and fair dealing.

cb.  Defendant Chase failed to credit the money paid and accepted by the Defendant Chase for over six months.

de.  Defendant Chase was repeatedly notified by Plaintiff that the money had been paid, had been deducted by his checking account by the Defendant Chase, and showed as paid on the mortgage statement generated by Defendant Chase.

e.  Defendant Chase intentionally or recklessly or in bad faith refused to acknowledge or correct its escrow calculations and on the basis of this refusal deemed the Plaintiff Lupo to be in default on his mortgage loan.

fd.  Defendant Chase breached the duty of good faith and fair dealing by its internal processes which allowed thieses material breaches to occur uncorrected after repeated notice by Plaintiff of theseis breaches.

g. Defendant Chase intentionally or recklessly or in bad faith adopted internal enterprise-wide software processes that encouraged, assisted, or facilitated such breach, including designing, implementing, and executing software processes that would resist and/or prohibit resolution of Defendant Chase's servicing errors but rather were calculated to escalate the servicing errors to the ultimate benefit of Defendants' Chase and it division and/or subagent SLS.

e.  Defendant Chase intentionally or recklessly adopted internal enterprise-wide software processes that caused or facilitated such breach.

hf.  As a result of these breaches by Defendant Chase, Plaintiff has suffered economic and non-economic damages.

## COUNT 15
## TORTIOUS INTERFERENCE WITH EMPLOYMENT CONTRACT

a.  Plaintiff incorporates ¶¶ 21-44 as if set forth fully herein.

26

b. ~~Plaintiff's employment requires top secret security clearances, which includes a requirement for financial integrity as reflected in his personal credit reports.~~

c. ~~Plaintiff repeatedly notified Defendants Chase and SLS that their failure to comply with the terms of the Mortgage and Note, failure to acknowledge his payments, failure to correct his credit report, and failure to otherwise take corrective action would breach this employment contract requirement.~~

d. ~~The Defendants intentionally or recklessly induced the breach of this employment contract without any privilege to do so.~~

e. ~~The Plaintiff's employment contract has been breached.~~

f. ~~As a result of the actions of Defendants Chase and SLS, Plaintiff has suffered economic and non-economic damages.~~

## COUNT 23~~16~~
## DEFAMATION

a. Plaintiff incorporates the allegations above ~~¶¶ 21-44~~ as if set forth fully herein

b. Defendants Chase and SLS falsely~~,~~ ~~and~~ without justification, and with reckless disregard for the truth, published to third parties including credit reporting agencies, statements about Defendant that are injurious to Defendant's reputation and damaging financially, including, but not limited to, that the Defendant had missed and/or was late on his mortgage loan payments.

c. As a result of the actions of Defendants Chase and SLS, Plaintiff has suffered economic and non-economic damages.

## COUNT 24
## TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS

a. Plaintiff incorporates the allegations above as if set forth fully herein.

b. Plaintiff's employment requires top secret security clearances, which includes a requirement for financial integrity as reflected in his personal credit reports.

c. Plaintiff repeatedly notified Defendants Chase and SLS that their failure to comply with the terms of the Mortgage and Note, failure to acknowledge his payments, failure to correct his credit report, and failure to otherwise take corrective action would breach this employment contract requirement.

d.  The Defendants intentionally and willfully interfered with Plaintiff's economic relations, without any privilege to do so, without right or justifiable cause, through their defamatory statements.

e.  The Defendants' acts were calculated to coerce Plaintiff to pay sums not due, to apply for refinancing and/or repackaging of his mortgage loan at an interest rate more favorable to them, and to cause damage to the Plaintiff in his lawful business.

f   The Defendants' acts interfered with the Plaintiff's economic relations and were the direct cause of Plaintiff being denied entry to the site of a new employer client.

g.  The Defendants' acts further interfered with the Plaintiff's economic relations as they directly harmed his economic prospects and interfered with his other business relationships, including his relationship with his creditors.

f.  As a result of the actions of Defendants Chase and SLS, Plaintiff has suffered economic and non-economic damages.

## COUNT 25~~17~~
## UNJUST ENRICHMENT~~MENT~~

a.  Plaintiff incorporates the allegations above~~¶¶ 21-42~~ as if set forth fully herein.

b.  Defendants Chase and SLS have~~as~~ been enriched by the Plaintiff's mortgage payments.

c.  Defendant~~s~~ Chase and SLS have~~s~~ impoverished the Plaintiff by accepting this money and then reporting it has not received it.

d.  Defendants Chase and SLS have impoverished the Plaintiff by churning his account through late fees, property management fees, and legal fees so as to wrongfully deprive the Plaintiff of all the equity he has invested in his residential property.

e~~d~~.  Defendants Chase and SLS have further impoverished Plaintiff by seeking to accelerate the Mortgage/Deed of Trust on Plaintiff's residential property based upon its claims of not receiving money it has accepted from Plaintiff.

f~~e~~.  Defendants Chase and SLS have no justification for seizing and selling the real estate property securing the Deed of Trust.

g.  Defendants Chase and SLS have been enriched or have obtained these benefits from the Plaintiff through fraud or by taking undue advantage of him

h~~f~~.  As a result of the actions of Defendants Chase and SLS, Plaintiff has suffered damages that require equitable relief.

## COUNT 26
## VIOLATION OF THE MARYLAND CONSUMER DEBT COLLECTION ACT
### Md. Code Ann. Com. Law §§ 14-201 *et seq.*
### Violations of §§ 14-202(8) and 14-202(9)

a.  Plaintiff incorporates the allegations above as if set forth fully herein.

b.  Defendant Chase, as the principal for its division and/or sub-agent, SLS, is liable as a principal for the actions of SLS in this matter.

c.  Defendants Chase and SLS have attempted to collect a debt arising from a mortgage on the Plaintiff's primary residence and are thus "collectors" within the meaning of the Maryland Consumer Debt Collection Act, Md. Code Ann., Com. Law § 14-201(b).

d.  Defendants Chase and SLS have continued to refuse to accept and apply Plaintiff's payments pursuant to his mortgage agreement, have continued to pursue collection of a miscalculated and erroneous escrow shortage, and as a result of that refusal and pursuit have sought to collect sums they were not otherwise entitled to collect or demand.

e.  Defendants Chase and SLS acted knowing that the debts were invalid or with reckless disregard as to the validity of the amounts claimed owed.

e.  The demands and statements for sums which are not due and owing under the mortgage agreement are attempts to enforce a right or collect a debt which Chase and SLS know does not exist in violation of § 14-202(8).

f.  Defendant SLS operated as a collection agency in Maryland without the license required by the Maryland Collection Agency Licensing Act, Md. Cod Ann., Bus. Reg. § 7-301(a) & 7-401(a), which is a violation of § 14-202(8)

g. Defendant Chase falsely represented or created a false impression that it was affiliated with the federal HAMP program or that it was authorized, for the improper purpose of collecting income information, tax information, and other information from Plaintiff Lupo to aid it in collecting a debt, or that the information it solicited from the Plaintiff was authorized, issued, or approved by the United States government.

h.  Defendant SLS falsely represented or created a false impression that its Trial Period Modification Plan was affiliated with the federal HAMP program and/or that its Trial Period Modification Plan was authorized, issued, or approved by the United States government.

g. Defendants Chase and SLS, by using communications that give the appearance of being authorized, issued, or approved by the United States government in order to

collect a debt when such communications were not so authorized, issued or approved by the United States government violated § 14-202(9).

i.. As a result of the actions of Defendants Chase and SLS, Plaintiff has suffered economic and non-economic damages.

## COUNT 27~~18~~
### VIOLATIONS OF MARYLAND'S CONSUMER PROTECTION LAWS
### MD Code Ann. Com. Law §13-101 *et seq.*
### <u>Violations of §§ 13-301(14)(iii), 303(1), (3), & (5)</u>

a. Plaintiff incorporates the allegations above ~~all preceding paragraphs~~ as if set forth fully herein.

b. Plaintiff incorporates Count 26, Violation of The Maryland Consumer Debt Collection Act, Md. Code Ann. Com. Law §§ 14-201 *et seq.,* violations of §§ 14-202(8) and 14-202(9) as if set forth fully herein.

c. Any violation of the Maryland Consumer Debt Collection Act is per se a violation of the Maryland Consumer Protection Laws, § 13-301(14)(iii).

d. Defendants Chase and SLS violated § 13-301(14)(iii) through their violations of §§ 14-202(8) and 202(9)

b. Chase, as the principal for its division and/or subagent ~~authorized sub-agent~~, SLS, is liable as a principal for the actions of SLS in this matter.

c. The mortgage loan servicing and transactions of Chase and SLS are governed by the Consumer Protection Act, Md. Code Ann., Com. Law. § 13-101 *et seq.*

d. Section 13-303(5) prohibits unfair or deceptive trade practices in the ~~the extension of consumer credit or~~ collection of consumer debts. The false statements, representations, and misstatements of Chase and SLS described herein ~~to Plaintiff claiming that Plaintiff breached the contract to pay a debt on Plaintiff's mortgage loan~~ involves ~~both~~ the ~~extension of credit and the~~ collection of debts:

    i. Defendant Chase falsely represented that its Chase Executive Services would assist Plaintiff with the resolution of his mortgage loan debt.

    ii. Defendant Chase falsely represented that its debt collectors were "loss mitigation analysts."

    iii. Defendant Chase falsely represented that Plaintiff could not self-manage his escrow account.

iv.  Defendant SLS falsely represented that its debt collectors were "loss mitigation analysts."

v.  Defendant SLS used illegible very small type (approximately 3-point font) in its initial notice of "Important Payment Options for Your Records."

vi  The Defendant further used an illegible 8-point font on its payment coupon to communicate payment options.

vii.  The use of illegible font by Defendant SLS was a deceptive means to induce the debtor to call the debt collector.

ix.  The Defendant SLS falsely represented that Plaintiff could not make his mortgage loan payments by ACH.

x.  Defendant Chase and Defendant SLS falsely represented or implied that Plaintiff's mortgage loan had been transferred, assigned, or sold for value for servicing, where in fact Chase had placed Plaintiff's mortgage loan in collections status and had so transferred, assigned, or sold the mortgage loan as a defaulted loan to Defendant SLS, which Defendant SLS had accepted as a defaulted debt.

xi..  Defendants Chase and SLS repeatedly and falsely represented the legal status of the debt Plaintiff owed by repeatedly and falsely claiming that it was accelerating Plaintiff's debt and that Plaintiff was in foreclosure before such acceleration and foreclosure legally occurred.

e. The Maryland Consumer Protection Act defines unfair or deceptive trade practices to include, *inter alia*, the following: "(a)  False, falsely disparaging, or misleading oral or written statement, visual description or other representation of any kind which has the capacity, tendency or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure deceives or tends to deceive."

f.  By engaging in the acts and omissions set forth above, and by making the misrepresentations set forth above, and by failing to disclose material facts where the failure to do so deceived or tended to deceive, the Defendants Chase and SLS have committed unlawful or deceptive trade practices in violation of the Maryland Consumer Protection Act §§ 13-301(1) and (3). and § 13-303(4).

g.  Defendants Chase and SLS intentionally or recklessly adopted internal enterprise-wide software processes that encouraged, assisted, or facilitated such acts and omissions, including designing, implementing, and executing software processes that were calculated to produce acts and omissions which would deceive the Plaintiff and which did deceive the Plaintiff. Chase and SLS have intentionally and/or recklessly adopted internal enterprise-wide software processes that encourage, assist, or facilitate such unfair or deceptive trade practices.

h.  The Plaintiff justifiably relied on these above representations and omissions when they were made and such representations and omissions induced his choices at the time they were made, which caused Plaintiff actual injury in the churning of his mortgage loan, loss of perfect credit history, and foreclosure on his property.

ih.  The conduct of Defendants Chase and SLS, as set forth above, had the capacity, tendency, and effect of unfairly and deceptively harming the Plaintiff, who has suffered economic and non-economic damages, including the actual injury of emotional distress and mental anguish.

### COUNT 19
### VIOLATION OF THE MARYLAND CONSUMER DEBT  COLLECTION ACT
### Md. Code Ann. Com. Law §§ 14-201 *et seq.*

a.  Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

b.  Chase, as the principal for its authorized sub-agent, SLS, is liable as a principal for the actions of SLS in this matter.

c.  Chase and SLS have attempted to collect a debt arising from a mortgage on the Plaintiff's primary residence and are thus "collectors" within the meaning of the Maryland Consumer Debt Collection Act, Md. Code Ann., Com. Law § 14-201(b).

d.  Chase and SLS have continued to refuse to honor Plaintiff's payments pursuant to his mortgage agreement and have as a result of that refusal have sought to collect sums they were not otherwise entitled to collect or demand.

e.  The demands and statements for sums which are not due and owing under the mortgage agreement are attempts to enforce a right or collect a debt which Chase and SLS know does not exist.

f.  As a result of the actions of Defendants Chase and SLS, Plaintiff has suffered economic and non-economic damages.

### COUNT 280
### VIOLATION OF THE MARYLAND MORTGAGE  FRAUD  ACT
### Md. Code Ann. Real Prop. §§ 7-401 *et seq.*

a.  Plaintiff incorporates the allegations above all preceding paragraphs as if set forth fully herein.

b.  Defendant Chase, as the principal for its division or subagentauthorized sub-agent, Defendant SLS, is liable as a principal for the actions of SLS in this matter.

c. The Maryland Mortgage Fraud Protection Act ("MMFPA"), Md. Code Ann., Real Prop. § 7-401 *et seq.*, governs the relationship between Defendants Chase and SLS and the Plaintiff.

d. The MMFPA works to protect the interests of all parties to mortgage transactions in Maryland from misstatements, misrepresentations, and omissions.

e. The Plaintiff is a homeowner in the mortgage lending process as defined by the MMFPA since the actions in dispute in this lawsuit involve the servicing of his residential mortgage loan and the attempts to collect payments due under the mortgage loan based upon the mortgage loan documents.

f. Md. Code Ann., Real Prop. § 7-401(d) provides:

"Mortgage fraud" means any action by a person made with the intent to defraud that involves:

> 1. Knowingly making any deliberate misstatement, misrepresentation or omission during the mortgage lending process with the intent that the misstatement, misrepresentation or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

> 2. Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.

> 3. Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1) or (2) of this section;

> 4. Conspiring to violate any provisions of item (1), (2), or (3) of this section.

g. Defendants Chase and SLS have committed mortgage fraud by knowingly making, as described herein, deliberate misstatements, misrepresentations, and omissions during the mortgage lending process, with the intent that the misstatements, misrepresentations, and omissions be relied on by the Plaintiff in the following manner:

h. Plaintiff incorporates Count 27, Violations of Maryland's Consumer Protection Laws, MD Code Ann. Com. Law §13-101 *et seq.,* violations of §§ 13-301(14)(iii), 303(1), (3), & (5) as if set forth fully herein.

ih. Defendants Chase and SLS knowingly claimed that Plaintiff had not tendered the payments he was required to tender when in fact he had done so.

j̶i̶. Defendants Chase and SLS knowingly and falsely informed Plaintiff that he had not complied with the terms of the Mortgage Note when he in fact had done so and it was Defendants Chase and SLS who had breached the agreement.

 ~~the terms of the Mortgage Note when he in fact had done so and it was Chase and SLS who had breached the agreement.~~

k̶j̶. Defendants Chase and SLS falsely misstated and demanded that the Plaintiff make payments in a manner not required under the mortgage loan documents governing the relationship between Defendant Chase and the Plaintiff.

l Defendants intentionally or recklessly adopted internal enterprise-wide software processes that encourage, facilitate, or assist in such unfair and deceptive trade practices, fraud and misrepresentations, including designing, implementing, and executing software processes that would resist and/or prohibit resolution of Defendant Chase's servicing errors but rather were calculated to escalate the servicing errors to the ultimate benefit of Defendants Chase and SLS.

m Defendants acted with intent as their business model incentivizes default based upon escrow miscalculations, as through the default process the Defendants generate additional fees, high late charges, legal fees, and the management fees for foreclosure and further provides opportunities for up-selling through refinancing or repackaging of a mortgage loan. k̶.̶ ~~Further, Chase and SLS have intentionally and/or recklessly adopted internal enterprise-wide software processes that encourage, assist, or facilitate such deliberate misstatements, misrepresentations, and omissions.~~

n̶l̶. As a result of the Defendants', by and through their authorized agents, knowingly deceptive misstatements, false representations, and untrue communications, Plaintiff has suffered economic and non-economic damages.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment in his favor and against Defendants Chase and SLS, and prays that the following relief be awarded to Plaintiff:

(a) A declaratory judgment, pursuant to 28 U.S.C. §§ 2201-2202, that Defendants have willfully violated the rights of the plaintiff as secured by the RESPA and FDCPA;

(b) A mandatory injunction enjoining Defendants from continuing to violate the RESPA and FDCPA and enjoining the Defendants from the sale of Plaintiff's residence;

(c) An injunction directing Defendants to correct Plaintiff's credit report with the three major credit reporting agencies;

(d)  As there is no adequate remedy at law for the claim of unjust enrichment, Plaintiff requests that the real estate property securing the Deed of Trust be placed in trust for the benefit and use of the Plaintiff;

(e)  An award for actual damages pursuant to 12 U.S.C. § 2605(f)(1)(A) and 15 U.S.C. § 1692(a)(1) representing back-pay and front-pay, plus pre-judgment interest and the value of lost employment and benefits (past and future) for three million six hundred thousand dollars, $3,600,000.00;

(f) Additional damages pursuant to § 2605(f)(1)(B), as the Court may allow, in the case of a pattern or practice of non-compliance with the requirements of 12 U.S.C. § 2605 in an amount not to exceed $2000.00.

(gf)  An award for compensatory damages and an award for emotional and mental distress pursuant to 15 U.S.C. § 1692k(a)(1) in the amount of two million five hundred thousand dollars ($2,500,000.00);

(hg)  Grant judgment to Plaintiff and against Defendant(s) in the amount of twelve million five hundred thousand dollars ($12,500,000.00) or in such other amount as is commensurate with the wrong as punitive and exemplary damages;

(ih)  An award for the costs of suit, including an award of reasonable attorneys' fees pursuant to 12 U.S.C. § 2605(f)(3) and 15 U.S.C. § 1692k(a)(3);

(ji)  That the Court retain jurisdiction over this action until Defendant has fully complied with the Orders of this Court and that the Court require Defendant to file such reports as may be necessary to supervise such compliance; and

(kj)  Such other and further relief as may be just and proper.

## VII. JURY DEMAND

Plaintiff herein demands trial by jury of all issues in this action.

Respectfully Submitted,

Louis M. Lupo, Pro Se
545 Elmcroft Boulevard., Apt 10213
Rockville, Maryland 20850
Telephone: 202-290-4379
louis.lupo@yahoo.com