IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LOUIS M. LUPO

          v.                   :   Civil Action No. DKC 14-0475

JPMORGAN CHASE BANK, N.A.,
et al.

**MEMORANDUM OPINION**

Presently pending and ready for resolution are (1) a motion for summary judgment filed by Defendant JPMorgan Chase Bank, N.A. (ECF No. 24); (2) Plaintiff Louis M. Lupo's verified motion in response (ECF No. 29); and (3) a partial motion to dismiss filed by Defendant Specialized Loan Servicing, LLC (ECF No. 33). The material issues have been briefed and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendant Chase's motion for summary judgment will be granted. Plaintiff's verified motion in response will be denied. Defendant SLS's partial motion to dismiss will be granted in part and denied in part.

I.   **Background**

   A.   **Factual Background[1]**

   Plaintiff Louis M. Lupo ("Plaintiff" or "Mr. Lupo") has lived in Montgomery County, Maryland, since 2011. (ECF No. 18 ¶ 5). He is employed by a federal contractor that stations him at various federal agencies throughout the Washington D.C. metropolitan area. (*Id.* ¶¶ 2-3). Defendant JPMorgan Chase Bank, N.A. ("Chase") is a national banking association that does business in Maryland, with its principal place of business in Ohio. (ECF Nos. 1-1, at 2; 1-2, at 2). Defendant Specialized Loan Servicing, LLC ("SLS") is a mortgage servicing corporation with its principal place of business in Colorado. (ECF No. 18 ¶ 13).

   Plaintiff's amended complaint alleges that, on December 20, 2007, he executed a 30-year fixed-rate promissory note (the "Note") for $173,850.00 at 6.0% annual interest rate payable to the lender, Chase, in monthly installments of $1,551.24. (*Id.* ¶ 31). On the same day, Plaintiff executed a deed of trust (the "DOT") to secure repayment of the Note with a lien against his

---

   [1] Unless otherwise noted, the facts outlined here are construed in the light most favorable to Plaintiff. Furthermore, the facts recounted in this section are drawn largely from Plaintiff's amended complaint and set forth in the prior memorandum opinion denying Defendant Specialized Loan Servicing, LLC's motion to dismiss based on improper venue or transfer based on *forum non conveniens*. (*See* ECF Nos. 18; 31).

property located in North Richland Hills, Texas (the "Property"). (*Id.* ¶ 33). The DOT specifies that it is "governed by federal law and the law of the jurisdiction in which the Property is located." (*Id.* ¶ 13). Plaintiff alleges that he thereafter made timely payments in full. (*Id.* ¶ 37). He complains that, since the inception of his mortgage loan, Defendant Chase, as loan servicer, has "miscalculated and overcharged for escrow" on his account every year. (*Id.* ¶ 38). For the first four years, Plaintiff alleges, he was able to secure a correction by a telephone call and find mortgage payments lost by Chase through the routing numbers for the mortgage payments. (*Id.* ¶¶ 39-40). However, Plaintiff contends that Chase made an error in 2013 that he has since been unable to resolve.

Plaintiff's specific allegations include that, on February 9, 2013, Chase "erroneously reported to Equifax that [he] was 30 days late on his November 30, 2012 mortgage loan payment" and "that Plaintiff was $4,000 delinquent for the month of November 2012." (*Id.* ¶¶ 46-47). Previously, Plaintiff's credit history was perfect. (*Id.* ¶ 43). He also alleges that the monthly payment including escrow averaged approximately $1,502.00 and that he telephoned Chase no fewer than ten times after discovering its report to Equifax. (*Id.* ¶¶ 48-49). During these telephone calls, Plaintiff was routed to loss mitigation

3

analysts and spoke to different Chase representatives, but they were unable to respond to his requests to correct his credit report and recalculate the escrow. (*Id.* ¶¶ 50-54). As a result, he asked Chase to investigate and inform him of the procedure for managing his own escrow, *i.e.*, paying his own taxes and insurance directly. (*Id.* ¶¶ 55-58). Eventually, he was told that the investor in the Note would not permit anyone other than Chase to manage his escrow account. (*Id.* ¶ 59). During these discussions, Plaintiff was offered refinancing or repackaging options, but he declined. (*Id.* ¶¶ 62-64). Plaintiff learned that the Note had been sold to Freddie Mac shortly after the 2007 closing, and that Freddie Mac does allow self-management for loans with more than 20% equity.[2] (*Id.* ¶¶ 65-66).

On February 14, 2013, Chase sent Plaintiff a letter identifying itself as a debt collector and stating that his mortgage is past due by two months and may be referred to foreclosure. (*Id.* ¶ 67). On February 22, 2013, Chase mailed Plaintiff a statement specifying that his escrow payment due was

---

[2] Plaintiff claims that he is in a position to self-manage his escrow account, but he alleges no facts suggesting that he has 20% equity in the property. (ECF No. 18 ¶ 66).

$978.48, a substantial increase from previous forecasts.[3] (*Id.* ¶ 69).  Conversations with Chase representatives followed, without resolution.  On March 21, 2013, Plaintiff disputed to Equifax, a credit reporting agency, the November 2012 delinquency as a Chase creditor mistake.  (*Id.* ¶ 78).  On the same day, he faxed a letter to Chase directly to the JPMorgan Chase CEO James Dimon's office setting forth the reasons that Plaintiff believed his account to be in error and requesting an investigation and correction of his escrow account.  (*Id.* ¶ 79).  The letter was copied to the Consumer Financial Protection Bureau ("CFPB"), which initiated an investigation.  (*Id.* ¶ 80).  Other discussions with Chase representatives occurred, but Defendant refused to correct Plaintiff's credit report, recalculate his escrow, or reconcile his mortgage loan account.  (*Id.* ¶¶ 83-91).  Plaintiff reports, however, that Chase "confirmed the errant credit report in amount and date per Equifax update April 5, 2013."  (*Id.* ¶ 92).  In a telephone conversation with David Grace of Chase Executive Services, Mr. Grace replied that he would not repair Plaintiff's credit report until he paid $2020.80 for his March 2013 mortgage payment, although Plaintiff contends that that amount was not due.  (*Id.* ¶¶ 93-98).

---

[3]  According to Plaintiff, the new amount represents an increase of over 150% from his usual monthly escrow forecast, which had been approximately $460 per month.  (ECF No. 18 ¶ 70).

Plaintiff contends that Chase's refusal to correct his credit report or conduct an escrow analysis and recalculation is memorialized in an April 15, 2013 letter faxed by Plaintiff to Chase. (*Id.* ¶¶ 99-100). Plaintiff alleges that, attached to his requests for Chase to investigate and recalculate, he provided supporting documentation to show that his loan payments were current and not in arrears. (*Id.* ¶¶ 79, 100). On April 17, 2013, Chase purported to respond, but continued to overcharge Plaintiff's escrow, refused to recalculate Plaintiff's escrow, and explained that it had reversed funds originally applied to interest and principal payment and instead applied these funds to the claimed escrow shortage. (*Id.* ¶¶ 101-04).

Chase, from February 2013 until May 2013 and through its representatives and correspondence with Plaintiff, informed Plaintiff that his loan payments were overdue, that Chase was a debt collector, and that it was attempting to collect a debt. (*Id.* ¶¶ 67, 90, 96, 101, 105, 114, 117). Chase refused to repair Plaintiff's credit report until he made various payments, all of which Plaintiff alleges were not owed to Chase. (*Id.* ¶¶ 91, 97-99). On May 4, 2013, Chase sent Plaintiff another letter stating that the loan was in default by two months. (*Id.* ¶¶ 114-16). On May 7, another letter demanded sums that Plaintiff alleges were not due. (*Id.* ¶¶ 117-19). On May 31, Chase mailed

a "Notice of Assignment, Sale, or Transfer of Servicing Rights" to Plaintiff, informing him that Chase could no longer accept payments on his mortgage loan and that the loan had been transferred and assigned to SLS with an effective date of June 17, 2013. (*Id.* ¶ 121).

On June 20, 2013, SLS mailed to Plaintiff a similar notice stating that all payments due after June 17, 2013 should be sent to SLS and demanding payment. (*Id.* ¶¶ 129-30). Plaintiff contends that the payment instructions provided by SLS were illegible. (*Id.* ¶¶ 131, 134). On or about June 24, Plaintiff contacted SLS by telephone to make an electronic payment. The SLS representative informed Plaintiff that his loan was in default and it would not accept his automated clearing house ("ACH") payment. (*Id.* ¶¶ 135-36). Plaintiff explained to SLS that his mortgage loan account was current and sought an investigation. When he called thereafter, he was told that the investigation was ongoing. (*Id.* ¶¶ 137-40). On July 1, Plaintiff called again and learned that he could not make an ACH payment for the month because his account was in default. (*Id.* ¶ 141). He was told that, if he provided proof of prior payment, SLS would then accept his ACH payment. Plaintiff faxed documentation to SLS on July 1, including proof of payment for the previous 20 months and requests that SLS investigate his loan history, recalculate his escrow payments, reconcile his

7

account, and correct his credit report. (*Id.* ¶¶ 142-43). On July 11, SLS sent Plaintiff a "Notice of Default and Notice of Intent to Accelerate," stating that he was in default as he had failed to make loan payments since April 2013. (*Id.* ¶¶ 144-46). SLS again sent Plaintiff a letter on August 14 informing him, *inter alia*, that he must make a payment on his loan by August 28, 2013 in order to halt the foreclosure process. (*Id.* ¶¶ 153-57). On August 21, Plaintiff sent a letter to both Chase and SLS protesting SLS's refusal to accept his July and August payments and again requesting an investigation, escrow recalculation, and credit report correction. This correspondence included supporting documentation and proof of payment. (*Id.* ¶ 147). In a letter dated September 6, 2013, SLS stated that Plaintiff's July 1 fax was not a "qualified written request" under the Real Estate Settlement Procedures Act, that Plaintiff was in default based on Chase's escrow analysis, and that SLS could not correct Plaintiff's credit report. (*Id.* ¶ 148).

Plaintiff's employment requires that he hold certain security clearances, which call for the holder to maintain financial integrity. (*Id.* ¶¶ 41-42). During his dispute with Chase and SLS, Plaintiff was being vetted for an employment position that required additional security clearances. (*Id.* ¶ 44). He alleges that, on December 26, 2013, as a result of

8

Defendants' erroneous credit reporting, he "was placed on 'Delayed for Entry to Duty' status with his new client employer" and denied a security clearance and access to his job site.[4] (*Id.* ¶¶ 160, 163-64).   In addition, several of Plaintiff's credit card accounts were closed.   (*Id.* ¶ 162).   As of January 5, 2014, according to Plaintiff, Defendants Chase and SLS neither had performed the investigation and reconciliation requested by Plaintiff, nor had they corrected his credit report.   (*Id.* ¶ 161).   Moreover, Plaintiff received a letter dated February 4 from Hughes, Watters & Askanase, LLP, on behalf of SLS, notifying him that the mortgage loan had been accelerated and that the Property would be foreclosed on and sold in a non-judicial sale on March 4, 2014.   (*Id.* ¶ 170).

Defendants agree that Plaintiff borrowed $173,850 in 2007 and made timely payments until November 2012, but contend that Plaintiff was 30 days late on his November 30, 2012 payment, an event that Chase reported to Equifax on February 9, 2013.   (ECF Nos. 24, at 2; 33-1, at 2).   According to Chase, the amount needed for escrow rose substantially due to a large increase in property taxes and a comparatively smaller increase in hazard insurance premiums, which in turn resulted in a larger shortage

---

[4] Although Plaintiff filed his amended complaint on April 4, 2014, he appears erroneously to have cited that he was placed on "Delayed for Entry to Duty" status on "December 26, 2014." (ECF No. 18 ¶ 160).   The relevant date must be December 26, 2013.

payment.   (ECF No. 24, at 4-6).   Relying on the same facts, SLS argues that Plaintiff's central factual allegations are directly rebutted by the available documentation, including tax records and Plaintiff's payment history.   (ECF No. 33-1, at 4).   At bottom, Defendants argue that the facts show that "Plaintiff's payment went up because his taxes went up; he refused to pay the higher payment; as a result of his refusal to pay the required amount, he went into default; and his default was properly reported to the credit reporting agencies."   (ECF No. 24, at 9).

### B.  Procedural History

Plaintiff, proceeding *pro se*, filed his original complaint against Defendants Chase and SLS on February 19, 2014.   (ECF No. 1).   SLS first moved to dismiss on March 13, 2014 (ECF No. 7), and Plaintiff filed his opposition (ECF No. 15).   Plaintiff subsequently filed a twenty-eight count amended complaint alleging multiple violations of the Real Estate Settlement Procedures Act ("RESPA"), Fair Credit Reporting Act ("FCRA"), Fair Debt Collection Practices Act ("FDCPA"), and various Maryland consumer protection and mortgage fraud statutes, as well as claims for breach of contract, breach of the duty of good faith and fair dealing, defamation, tortious interference with economic relations, and unjust enrichment.   (ECF No. 18, at 17-31).   Plaintiff requests declaratory relief, injunctive relief, damages, and costs.   (*Id.* at 31-32).   If there is no

adequate legal remedy, Plaintiff asks that a constructive trust be placed on the Property. (*Id.* at 31).

On April 16, 2014, Defendant SLS moved to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(6) or 12(b)(3), or to transfer this action on the ground of *forum non conveniens* to the United States District Court for the Northern District of Texas. (ECF No. 19). Plaintiff opposed SLS's motion (ECF No. 22) and SLS replied (ECF No. 23). SLS's Rule 12(b)(3) and transfer motions were denied, but judgment was reserved on SLS's motion to dismiss under Rule 12(b)(6). (ECF No. 31, at 6 n.3).

Also pending is Defendant Chase's motion for summary judgment filed on October 30, 2014. (ECF No. 24). Plaintiff responded in opposition, requesting that the court defer or deny its decision on Chase's summary judgment motion until disposition of SLS's motion to dismiss or pending additional discovery pursuant to Fed.R.Civ.P. 56(d). (ECF No. 29). Chase replied. (ECF No. 30). SLS filed a renewed partial motion to dismiss Plaintiff's amended complaint on February 5, 2015. (ECF No. 33). Plaintiff responded in opposition and noted that SLS's earlier Rule 12(b)(6) motion "is still under consideration by the Court." (ECF No. 35, at 1). SLS replied, explaining that its "counsel somehow missed footnote six to the Court's Memorandum Opinion [ECF No. 31] and thus renewed its Rule

12(b)(6) and 12(b)(3) motion to dismiss out of an abundance of caution."[5]  (ECF No. 38, at 1 n.2).

## II.  Defendant Chase's Motion for Summary Judgment

### A.   Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).

---

[5] The earlier opinion to which SLS refers does not have a "footnote six."  Instead, SLS presumably intended to reference footnote three on page six.  (*See* ECF No. 31, at 6 n.3).

The moving party bears the burden of showing that there is no genuine dispute as to any material fact.  If the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof, then there is no genuine dispute of material fact. *Celotex*, 477 U.S. at 322–23.  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial.  *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014).  The mere existence of a "scintilla" of evidence in support of the nonmoving party's case, however, is not sufficient to preclude an order granting summary judgment. *Liberty Lobby*, 477 U.S. at 252.  A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).  In other words, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts' showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)).

**B.   Analysis**

**1.   RESPA**

Congress enacted RESPA "to insure that consumers . . . are provided with greater and more timely information on the nature and costs of the settlement process" and "to effect certain changes in the settlement process for residential real estate," such as the reduction of "the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance." 12 U.S.C. §§ 2601(a), (b)(3). Plaintiff asserts claims under RESPA against both Defendants in Counts 1-12 of his amended complaint. *Id.* § 2605(e).   In Counts 1-4, Plaintiff alleges that Defendants collectively failed timely to acknowledge receipt of RESPA qualified written requests ("QWR").   In Counts 5-8, Plaintiff contends that Defendants failed to conduct an investigation and respond properly to his QWRs.  And in Counts 9-12, Plaintiff argues that Defendants violated RESPA in continuing to report adverse credit information after receipt of his QWRs.   Triggering certain duties under RESPA, a QWR is defined as:

> A written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--
>
> > (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

14

> (ii) includes a statement of the
> reasons for the belief of the borrower,
> to the extent applicable, that the
> account is in error or provides
> sufficient detail to the servicer
> regarding other information sought by
> the borrower.

*Id.* § 2605(e)(1)(B).

Although he is not explicit, Plaintiff appears to contend that two of his communications to Chase constitute QWRs. According to Chase, and Plaintiff does not offer clarification in his opposition, Plaintiff's purported Chase QWRs are: (1) the letter Plaintiff faxed to Mr. Dimon on March 21, 2013 (the "Dimon Letter"); and (2) the letter Plaintiff faxed to Chase on April 15, 2013 (the "April 2013 Request"). (ECF No. 18 ¶¶ 79, 100). Chase argues that neither communication satisfies the statutory QWR definition "because neither was addressed to the exclusive and separate address established by Chase." (ECF No. 24-1, at 10).

> RESPA's implementing regulations allow (but
> do not require) servicers to establish a
> designated address for QWRs. *See* 24 C.F.R.
> § 3500.21(e)(1) ("By notice either included
> in the Notice of Transfer or separately
> delivered by first-class mail, postage
> prepaid, a servicer may establish a separate
> and exclusive office and address for the
> receipt and handling of qualified written
> requests."). The final rulemaking notice
> for the operative regulation, Regulation X,
> explained that if a servicer establishes a
> designated QWR address, "then the borrower
> must deliver its request to that office in
> order for the inquiry to be a 'qualified

15

> written request.'"   Real Estate Settlement
> Procedures  Act,  Section  6,  Transfer  of
> Servicing of Mortgage Loans (Regulation X),
> 59 Fed.Reg. 65,442, 65,446 (Dec. 19, 1994).

*Roth v. CitiMortgage Inc.*, 756 F.3d 178, 181 (2[d] Cir. 2014).  If "a servicer complies with the notice requirements . . . for designating a QWR address, a letter sent to a different address is not a QWR, even if an employee at that address (who may not have training in RESPA compliance) in fact responds to that letter." *Id.* at 182.

Here, Chase provides mortgage loan statements for the periods ending February 28, 2013 and March 22, 2013, each informing Plaintiff of an "Exclusive and Separate Address for Qualified Written Requests." (*See* ECF Nos. 24-4, at 4; 24-5, at 3).  Plaintiff does not dispute that his mortgage statements from Chase designated a QWR address, or that he failed to use that address.  Accordingly, Plaintiff has failed to produce evidence that Chase did not properly designate a QWR address or that he sent qualifying correspondence to the designated address.  The Dimon Letter and April 2013 Request are not QWRs, Chase's RESPA duties were not triggered, and summary judgment will be entered against Plaintiff on the RESPA claims he asserts against Chase.

### 2.   FCRA

Plaintiff asserts an FCRA claim against Chase, arguing that "Chase failed to conduct reasonable investigation or otherwise comply with duties" under the statute.   (ECF No. 18, at 19). Section 1681s-2(b)(1) imposes a duty on furnishers of credit information to investigate disputed information "after receiving notice pursuant to section 1681i(a)(2)."   One such duty is to "review all relevant *information provided by the consumer reporting agency* pursuant to section 1681i(a)(2) of this title." 15 U.S.C. § 1681s-2(b)(1)(B) (emphasis added).   Accordingly, Chase, as furnisher of credit information, has no responsibility to investigate a credit dispute "until it receives notification of a dispute from a consumer reporting agency." *Mavilla v. Absolute Collection Serv., Inc.*, 539 F. App'x 202, 208 (4th Cir. 2013) (citations omitted).

Here, Plaintiff's amended complaint contains no allegation that a credit reporting agency provided Chase with a notice of dispute.   Furthermore, Plaintiff presents no evidence in his opposition to support his claim that Chase's FCRA duties were triggered.   As a result, summary judgment will be entered in favor of Chase on Count 13.

### 3.   FDCPA

Plaintiff asserts claims against Chase arising under the FDCPA in Counts 14-20 of his amended complaint.   The FDCPA

protects consumers from debt collectors that engage in abusive and deceptive debt collection practices. *See United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 135 (4th Cir. 1996). Each of Plaintiff's claims is predicated upon his belief that Chase is a "debt collector" under the statute. *See* 15 U.S.C. § 1692a(6)(F).

> [T]o properly allege that [the defendant lender] is a debt collector under the FDCPA, [the plaintiff borrower] would have to assert that [the defendant] was attempting to collect "debts owed or due or asserted to be owed or due *another*." 15 U.S.C. § 1692a(6) (emphasis added). Moreover, the FDCPA expressly exempts creditors and mortgagees from its definition of a debt collector. *See* 15 U.S.C. § 1692(a)(6); *Sparrow*[ *v. SLM Corp.*, No. RWT 08-00012, 2009 WL 77462, at *2 (D.Md. Jan. 7, 2009)]. Here, by all appearances, [the defendant] was at all relevant times acting as a creditor and mortgagee to collect a debt owed to itself, not to a third party; in other words, it does not fall under the FDCPA's definition of a debt collector.

*Givens v. Citimortgage, Inc.*, No. PJM-10-1249, 2011 WL 806463, at *2 (D.Md. Feb. 28, 2011). The FDCPA expressly exempts "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was originated by such person." 15 U.S.C. § 1692a(6)(F)(ii).

Chase, as grantee of the DOT securing Plaintiff's mortgage loan, was collecting a debt that it originated. (*See* ECF No. 18

¶ 31).  Like the defendant in *Givens*, Chase was "acting as a creditor and mortgagee to collect a debt owed to itself," and thus the statutory exemption applies.  2011 WL 806463, at *2. Because Chase is not a "debt collector" under the FDCPA, Plaintiff's Counts 14-20 must fail as against Chase.  Summary judgment will be entered against Plaintiff.

### 4.  Breach of Contract

Plaintiff asserts a claim for breach of contract against Chase in Count 21 of his amended complaint.  This action arises under the DOT, and Texas law applies.[6]  To establish a breach of

---

[6] In a prior response in opposition, Plaintiff asserted that "only three counts of the Complaint require application of Texas state law: the breach of contract claim, the breach of duty . . . of good faith and [fair] dealing, and the unjust enrichment claim."  (ECF No. 15, at 6).  Plaintiff incorporates this earlier filing into his latest opposition to SLS's partial motion to dismiss.  (*See* ECF No. 35-1, at 2).  Defendants Chase and SLS, however, do not address relevant choice-of-law issues and variously cite to Maryland and Texas case law throughout their filings.

The law of the forum state, Maryland, guides the choice-of-law analysis.  *See Baker v. Antwerpen Motorcars Ltd.*, 807 F.Supp.2d 386, 389 n.13 (D.Md. 2011) ("In a federal question [claim] that incorporates a state law issue, . . . a district court applies the choice-of-law rules of the state in which it sits unless a compelling federal interest directs otherwise.").  In a contract claim, Maryland courts follow the rule of *lex loci contractus*, applying the substantive law of the state where the contract was formed, unless there is a choice-of-law provision in the contract.  *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573 (1995).  "Contracts relating to the sale of realty are generally governed by the law of the jurisdiction in which the property is located."  *Traylor v. Grafton*, 273 Md. 649, 660 (1975).  Here, the DOT also provides: "This Security Instrument shall be governed by federal law and the law of the

contract cause of action in Texas, a plaintiff must show: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages suffered by the plaintiff as a result of the breach. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (citation omitted). "A breach of contract . . . only occurs when a party fails or refuses to perform an act that it expressly promised to do." *Gonzales v. Columbia Hosp. at Med. City Dall. Subsidiary LP*, 207 F.Supp.2d 570, 575 (N.D.Tex. 2002) (citation omitted). Furthermore, to plead a breach of contract claim, a plaintiff must identify a specific provision of the contract that was allegedly breached. *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Georgia, Inc.*, 995 F.Supp.2d 587, 602 (N.D.Tex. 2014) (citations omitted).

Here, Chase acknowledges that the loan document qualifies as a contract between the parties, but it denies that it breached the contract. (ECF No. 24-1, at 16). Chase has provided evidence showing that it instructed Plaintiff to make payments of $2,202.80 beginning in May 2012 as part of his obligation under the DOT to make payments on escrow, principal, and interest. Plaintiff refused to make these higher payments

---

jurisdiction in which the Property is located." (ECF No. 24-6, at 20). Because the Property is located in Texas, Texas law will be applied in analyzing Plaintiff's contract claims.

and "instead continued to make the lower, previously effective payment of $1,501.58." (*Id.*).  In the section titled "Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges," the DOT provides that "Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current." (ECF No. 24-6, at 14).  Accordingly, Chase had the option under the contract to refuse Plaintiff's partial payments, and Chase provided Plaintiff with an explanation in its response to the April 2013 Request. (*See* ECF No. 24-6, at 2-3).  Plaintiff alleges no facts and presents no evidence in his opposition to support his claim that Chase breached the contract.

### 5.  Breach of the Duty of Good Faith and Fair Dealing

In Count 22 of his amended complaint, Plaintiff asserts that Chase breached its duty of good faith and fair dealing.[7]  In Texas, "[a] common-law duty of good faith and fair dealing does not exist in all contractual relationships." *Subaru of Am. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225 (Tex. 2002) (citation omitted).  In fact, the Texas Supreme Court has expressly rejected the imposition of a duty of good faith and fair dealing in all contracts. *Childers v. Pumping Sys., Inc.*,

_____

[7] Although Chase cites only to Maryland law in its summary judgment motion, this action arises under the DOT and Texas law governs.

968 F.2d 565, 568 (5th Cir. 1992).   The duty arises only by express contractual language or when there is a special relationship between the parties.   *See id.*   "Generally, a special relationship resulting in the imposition of the duty of good faith and fair dealing is found between an insurance company and its insured, but Texas courts have been reluctant to extend the duty of good faith and fair dealing to other contractual relationships."   *Bass v. Hendrix*, 931 F.Supp. 523, 533-34 (S.D.Tex. 1996) (citation omitted).   Furthermore, the "duty of good faith and fair dealing is aimed at making effective the agreement's promises," *Fetter v. Wells Fargo Bank Tex., N.A.*, 110 S.W.3d 683, 689 (Tex.App. 2003) (citation omitted), but "does not create any new obligations" other than those arising from the terms of the contract itself.   *John Wood Grp. USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 22 (Tex.App. 2000). In other words, should the duty of good faith and fair dealing apply, it would not obligate a lender to take affirmative actions that are not required to take under its loan agreement.

Here, there is no contract between Chase and Plaintiff upon which a duty of good faith and fair dealing could be engrafted. Plaintiff has not offered evidence of a special or fiduciary relationship between Chase and Plaintiff, and such a "relationship does not usually exist between a borrower and lender" under Texas law. *Bank One, Texas, N.A. v. Stewart*, 967

S.W.2d 419, 442 (Tex.App. 1998).   Neither has Plaintiff provided evidence demonstrating a long-standing personal or social relationship or inequality in bargaining positions between the parties, from which a duty of good faith and fair dealing could arise.  *See Bass*, 931 F. Supp. at 534.   Therefore, Plaintiff's claim for breach of the duty of good faith and fair dealing in Count 22 cannot survive summary judgment.

Even under Maryland law, the duty of good faith "does not obligate [a lender] to take affirmative actions that the [party] is clearly not required to take under [the contract]."  *Parker v. Columbia Bank*, 91 Md.App. 346, 366 (1992).  In faulting Chase for its failure to accept his partial loan payments, Plaintiff effectively argues that Chase did not take certain actions that it was not required to take under the DOT.   Absent additional evidence to show that Chase frustrated the purpose of the contract or prevented Plaintiff from performing his obligations, neither can Plaintiff succeed under Maryland law.

### 6.   Defamation

The parties treat Maryland law as controlling with regard to Plaintiff's defamation claims.   Plaintiff, a resident of

Maryland at all relevant times, was allegedly injured by Defendants' defamatory statements in Maryland.[8]

In Count 23, Plaintiff alleges that Chase falsely, without justification, and with reckless disregard for the truth, published to credit reporting agencies statements about Plaintiff that are injurious to his reputation and financially damaging. (ECF No. 18, at 25). Chase disputes that Plaintiff has provided facts or allegations sufficient to demonstrate a prima facie defamation case. (ECF No. 24-1, at 17-18). Under Maryland law, to establish a *prima facie* case, Plaintiff must prove that: (1) the defendant made a defamatory communication to a third person; (2) the statement was false; (3) the defendant was at fault in communicating the statement; and (4) the plaintiff suffered harm. *See Thacker v. City of Hyattsville*, 135 Md.App. 268, 313 (2000). Thus, a defamation plaintiff has the burden of proving the falsity of the alleged defamatory

---

[8] For tort claims, Maryland applies the principle of *lex loci delicti*, or the law of the "place of the alleged harm." *Proctor v. Washington Metropolitan Area Transit Auth.*, 412 Md. 691, 726 (2010). "*Lex loci delicti* dictates that when an accident occurs in another state[, the] substantive rights of the parties, even though they are domiciled in Maryland, are to be determined by the law of the state in which the alleged tort took place." *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 745 (2000) (citation and internal quotation marks omitted). Given Plaintiff's location, the alleged harms would have occurred in Maryland. In light of these considerations, Maryland law will govern with respect to the analysis of Plaintiff's claims sounding in tort. As noted, this is consistent with the parties' arguments.

statements. *Gen. Motors Corp. v. Piskor*, 277 Md. 165, 171 (1976). Given that Plaintiff bears the burden of demonstrating falsity, he must provide evidence supporting his contention that Chase's statements to third parties were untrue. Plaintiff, however, fails to meet this burden. In his amended complaint, he effectively concedes that he did not pay in full the monthly fees sought by Defendants. (ECF No. 18 ¶¶ 70-71, 97-98); *see Ervin v. JP Morgan Chase Bank NA*, No. GLR-13-2080, 2014 WL 4052895, at *6 (D.Md. Aug. 13, 2014) (footnote omitted) (citation omitted) (noting that "[e]ven if there was a dispute or actual error as to the escrow analysis, however, this dispute did not justify [the borrower's] decision to pay less than the full amount owed"). Although underpinning Plaintiff's case is his contention that he did not default on his mortgage loan obligations, he acknowledges that he did not make payments in the amounts specified by his loan servicers.

Plaintiff fails to offer evidence sufficient to state a defamation claim against Chase.

### 7.  Tortious Interference with Economic Relations

Again, the parties treat Maryland law as controlling with regard to Plaintiff's claims for tortious interference with economic relations. Plaintiff's alleged injury took place in Maryland. In Count 24, Plaintiff argues that Chase intentionally and willfully interfered with Plaintiff's economic

25

relations.    To state a claim of tortious interference with economic relations under Maryland law, Plaintiff must demonstrate: (1) an intentional and willful act on the part of the defendant; (2) calculated to cause damage to the plaintiff in plaintiff's economic relations; (3) done with an unlawful purpose, without right or justification, which constitutes malice; and (4) resulting in actual damage and loss to the plaintiff. *Blondell v. Littlepage*, 413 Md. 96, 125 (2010).

Chase contends that it "was simply reporting a customer's delinquency to the credit reporting agencies." (ECF No. 24-1, at 18). Chase argues that its reports were factually correct, as Plaintiff was delinquent on his loan. (*Id.*). Moreover, Plaintiff has not offered facts or evidence either to counter Chase's contention or to demonstrate that Chase acted willfully and without right or justifiable cause in causing damage to Plaintiff. *See Kwang Dong Pharm. Co. v. Han*, 205 F.Supp.2d 489, 496 (D.Md. 2002) (citing *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69-70 (1984)). Summary judgment will be entered for Chase.

8.   **Unjust Enrichment**

Plaintiff's unjust enrichment claim will be analyzed under Texas law.[9]  Chase contends that Plaintiff failed to plead facts alleging or offer evidence demonstrating that Chase was unjustly enriched.  (ECF No. 24-1, at 18-19).  Generally, unjust enrichment provides "restitution when a party receiving property or benefits would be unjustly enriched if it were permitted to retain the property or benefits at the expense of another." *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 43 (Tex. 1992) (Gammage, J., dissenting) (citation omitted).  Although Texas courts still occasionally refer to an "unjust enrichment claim," *see, e.g., Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869 (Tex. 2007), "these opinions do not, however, characterize unjust enrichment as a separate cause of action from money had and received; they consider it to be a general theory of recovery for an equitable action seeking restitution."  *Hancock v. Chicago Title Ins. Co.*, 635 F.Supp.2d

---

[9]  Maryland employs the same choice-of-law analysis for unjust enrichment claims as for contract claims.  *See Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 142 Md.App. 476, 490-92 (2002) (stating that *lex loci contractus*, "the place the contract was made," determines choice of law in contract disputes and unjust enrichment claims); *RaceRedi Motorsports, LLC v. Dart Mach., Ltd.*, 640 F.Supp.2d 660, 666 (D.Md. 2009) (applying the rule of *lex loci contractus* to determine choice-of-law for an unjust enrichment claim).  Because Plaintiff's property is located in Texas and the DOT provides that Texas law governs claims brought under the loan agreement, Plaintiff's unjust enrichment claim will be analyzed under Texas law.

539, 560 (N.D.Tex. 2009) (dismissing the plaintiffs' unjust enrichment claims).  As a result, Plaintiff cannot sustain his claim for unjust enrichment stated in Count 25 of his amended complaint.

Were Maryland law controlling, Plaintiff would not survive summary judgment because he fails to identify any payments or items of value received and retained by Chase "under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of it[s] value." *Klein v. Fid. & Deposit Co. of Am.*, 117 Md.App. 317, 346 (1997) (citation omitted).  Rather, Plaintiff was required to make payments under the loan agreement and, after May 2012, was in default for failing to pay in full.

### 9. Maryland Consumer Protection Laws

In Counts 26-28, Plaintiff states claims against Defendants under the Maryland Consumer Debt Collection Act ("MCDCA"), the Maryland Consumer Protection Act ("MCPA"), and the Maryland Mortgage Fraud Protection Act ("MMFPA").  Although SLS challenged the applicability of these Maryland consumer protection statutes to the present case (*see* ECF No. 19-1, at 22) and Chase expressly adopts and incorporates SLS's arguments into its summary judgment motion (ECF No. 24-1, at 8), Chase also advances arguments on the merits (*see* ECF No. 24-1, at 19-21).

### a.   MCDCA

In  Count  26  of  the  amended  complaint,  Plaintiff  asserts
claims  against  Chase  under  the  MCDCA.   Md.  Code  Ann.,  Com.  Law  §
14-201,  *et  seq*.   Plaintiff  states  that  "Chase,  as  the  principal
for  its  division  and/or  sub-agent,  SLS,  is  liable  as  a  principal
for  the  actions  of  SLS."   (ECF  No.  18,  at  26).   In  support  of
this  claim,  Plaintiff  merely  alleges  that  "Defendant  SLS  is  a
division  and/or  subagent  of  Defendant  Chase."   (*Id.*  ¶  14).
Plaintiff  provides  no  evidentiary  support  for  his  contention.
Furthermore,  as  Plaintiff  cannot  demonstrate  that  Chase  is
vicariously  liable  as  a  principal  for  the  actions  of  SLS,  he
cannot  assert  liability  against  the  assignor  of  a  loan  arising
from  the  acts  of  the  assignee.   *See,  e.g.,*  6A  C.J.S.  Assignments
§  120  ("Ordinarily  the  assignor  is  not  liable  for  damages
arising  subsequent  to  the  assignment  occasioned  by  acts  of  the
assignee.").

Plaintiff  also  asserts  that  Chase,  acting  with  knowledge
that  Plaintiff's  debt  was  invalid,  attempted  "to  enforce  a  right
with  knowledge  that  the  right  does  not  exist."   Md.  Code  Ann.,
Com.  Law  §  14-202(8).   Plaintiff  thus  attacks  the  validity  of
sums  Chase  demanded  under  the  mortgage  agreement.   However,  the
MCDCA  does  not  allow  for  recovery  based  on  errors  or  disputes  in
the  process  or  procedure  of  collecting  legitimate,  undisputed
debts.   *Marchese  v.  JPMorgan  Chase  Bank,  N.A.*,  917  F.Supp.2d

452, 464 (D.Md. 2013). Furthermore, the MCDCA is meant to proscribe certain methods of debt collection and is not a mechanism for attacking the validity of the debt itself. *Fontell v. Hassett*, 870 F.Supp.2d 395, 405 (D.Md. 2012) ("[The MCDCA] focuses on the conduct of the debt collector in attempting to collect on the debt, whether or not the debt itself is valid."). Accordingly, because the MCDCA provides no basis for liability in contesting the underlying debt, as Plaintiff seeks to do here, Plaintiff's argument must fail.

In addition, Plaintiff asserts that Chase used "communication[s] which . . . give[] the appearance of being authorized, issued, or approved by a government, governmental agency, or lawyer when [they are] not." Md. Code Ann., Com. Law § 14-202(9). Beyond conclusory allegations in his amended complaint, however, Plaintiff does not offer any supporting evidence. Summary judgment will be entered in favor of Chase on Plaintiff's MCDCA claims included in Count 26.

### b. MCPA

In Count 27, Plaintiff states several claims against Chase arising under the MCPA. Md. Code Ann., Com. Law § 13-101, *et seq.* Plaintiff's first claim refers to Chase's purported violation of the MCDCA. *See id.* § 13-301(14)(iii) (establishing that any violation of the MCDCA is a *per se* violation of the MCPA). However, as discussed in the foregoing section, summary

judgment will be entered in favor of Chase on Plaintiff's MCDCA claims.

Plaintiff's remaining claims against Chase arising under the MCPA are based on allegations that Chase falsely represented that: (1) it would assist Plaintiff with the resolution of the loan; (2) its debt collectors were "loss mitigation analysts"; (3) Plaintiff could not self-manage his escrow account; (4) Plaintiff's mortgage loan had been transferred, assigned, or sold for value for servicing when in fact Chase placed the loan in collections status and SLS accepted it as a defaulted debt; and (5) Plaintiff was in foreclosure and Defendants would be accelerating Plaintiff's debt. (ECF No. 18, at 28-29). He further alleges that Chase adopted software that facilitated the above-mentioned misrepresentations. (*Id.* at 29). In its summary judgment motion, Chase argues that Plaintiff cannot demonstrate that he was damaged by its alleged misrepresentations.[10] (ECF No. 24-1, at 20-21). A private party bringing suit under the MCPA:

> must establish that he or she has suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the . . .

---

[10] Chase asserts that Plaintiff "is unable to state damages" caused by its purported misrepresentations, which at summary judgment stage will be construed as a challenge to Plaintiff to offer evidence supporting his MCPA claims. (ECF No. 24-1, at 21).

> misrepresentation.    Thus,  Plaintiffs  must
> establish  actual  injury  or  loss,  despite  the
> language  in  §  13-302[,]  [i.e.,  that  [a]ny
> practice  prohibited  by  this  title  is  a
> violation . . . whether  or  not  any  consumer
> in  fact  has  been  misled,  deceived,  or
> damaged  as  a  result  of  that  practice.]

*Green v. Wells Fargo Bank, N.A.*, 927 F.Supp.2d 244, 254 (D.Md.

2013), *aff'd*, 582 F.App'x 246 (4th Cir. 2014) (citations and

internal  quotation  marks  omitted); *see  also  Willis  v.*

*Countrywide Home Loans Servicing, L.P.*, No. CCB-09-1455, 2009 WL

5206475,  at  *6  (D.Md.  Dec.  23,  2009)  (citation  and  internal

quotation  marks  omitted)  ("[A]n  individual  may  only  bring  a

claim  under  the  [M]CPA,  therefore,  if  she  can  establish  the

nature  of  the  actual  injury  or  loss  that  he  or  she  has  allegedly

sustained  as  a  result  of  the  prohibited  practice.").

Here,  Plaintiff  has  not  offered  any  evidence  that  he  was

actually   damaged   as   a   result   of   Chase's   alleged

misrepresentations.    This   is   so,   Chase   notes,   because

Plaintiff's  "problems  arise  from  his  failure  to  make  the

payments  required  –  not  from  any  action  taken  by  Chase."  (ECF

No.  24-1,  at  21).    Although  Plaintiff  includes  in  his  amended

complaint  general  statements  that  "he  justifiably  relied  on"

Chase's  misrepresentations  (ECF  No.  18,  at  29),  he  does  not

provide  any  supporting  evidence.    Such  evidence  certainly  would

be  within  his  control  or  personal  knowledge.    Given  that

Plaintiff   has   offered   nothing   to   counter   Chase's   summary

judgment motion, and that Plaintiff's allegations indicate that he consistently disputed Chase's position that the mortgage loan was in default, Plaintiff's MCPA claims must fail as against Chase. *See Castle v. Capital One, N.A.*, No. WMN-13-1830, 2014 WL 176790, at *6 (D.Md. Jan. 15, 2014); *Coulibaly v. J.P. Morgan Chase Bank, N.A.*, No. DKC-10-3517, 2011 WL 3476994, at *19 (D.Md. Aug. 8, 2011) (applying Maryland law and concluding that the plaintiff could not establish reliance element of fraud claim where "the complaint indicates that Plaintiff protested many of [the defendant]'s actions at every opportunity"). Summary judgment will be entered in favor of Chase on Plaintiff's MCPA claims.

    **c.  MMFPA**

In Count 28, Plaintiff asserts MMFPA violations against Defendants. Md. Code Ann., Real Prop. § 7-401, *et seq*. To the extent that Plaintiff seeks to assert an MMFPA claim against Chase on the basis of assignor or vicarious liability, the foregoing analysis is sufficient. *See supra* Part II.B.9.a (noting that Plaintiff provides no evidentiary support for the alleged agency relationship and cannot assert against an assignor of a loan liability arising from the acts of the assignee). Under the MMFPA:

> "Mortgage fraud" means any action by a
> person made with the intent to defraud that
> involves:

(1) Knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(2) Knowingly creating or producing a document for use during the mortgage lending process that contains a deliberate misstatement, misrepresentation, or omission with the intent that the document containing the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(3) Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(4) Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1), (2), or (3) of this subsection; [or]

(5) Conspiring to violate any of the provisions of item (1), (2), (3), or (4) of this subsection.

Md. Code Ann., Real Prop. § 7-401(d).  The "mortgage lending process" broadly includes the "solicitation, application, origination, negotiation, servicing, underwriting, signing,

closing, and funding of a mortgage loan." *Id.* § 7-401(e)(2)(i). The MMFPA provides a private right of action "for damages incurred as a result of a violation of this subtitle." *Id.* § 7-406(a)(1).

Plaintiff argues that Chase made deliberate "misstatements, misrepresentations, and omissions during the mortgage lending process" sufficient to create liability. (*See* ECF No. 18, at 30-31). The MMFPA does not define the terms "misstatement," "misrepresentation," or "omission," as used in the statute. However, MMFPA claims sound in common law fraud and Plaintiff "must establish the elements of fraud 'by clear and convincing evidence.'" *Ademiluyi v. PennyMac Mortgage Inv. Trust Holdings I, LLC*, 929 F.Supp.2d 502, 530 (D.Md. 2013) (quoting *Md. Envir. Trust v. Gaynor*, 370 Md. 89, 97 (2002)); *see Galante v. Ocwen Loan Servicing LLC*, No. ELH-13-1939, 2014 WL 3616354, at *28 (D.Md. July 18, 2014). To maintain an action for fraudulent misrepresentation, Plaintiff must demonstrate that, *inter alia*, he "relied on the misrepresentation and had the right to rely on it" and that he "suffered compensable injury resulting from the misrepresentation." *Ademiluyi*, 929 F.Supp.2d at 520. The foregoing analysis with respect to Plaintiff's MCPA claims applies here as well, *see supra* Part II.B.9.b, as Plaintiff cannot demonstrate reliance or resulting damage. At the summary judgment stage, Plaintiff may not rest on general allegations;

35

rather, he must offer evidence from the record, including affidavits or declarations made on personal knowledge. Fed.R.Civ.P. 56(c)(4). Given Plaintiff's failure to present evidence demonstrating that Chase violated the MMFPA, summary judgment will be entered in favor of Chase.

## III. Plaintiff's Verified Motion in Response to Defendant Chase's Motion for Summary Judgment

Responding in opposition to Defendant Chase's summary judgment motion, Plaintiff requests that this court defer decision on or deny without prejudice Chase's motion pending disposition of Defendant SLS's unresolved motion to dismiss. Through these requests, Plaintiff attempts to avoid summary judgment by deferral or delay rather than by asserting facts sufficient to raise a triable issue.

### A.   Plaintiff's Request to Defer Judgment Pending Disposition of Defendant SLS's Motion to Dismiss

Plaintiff supports his position by citing Local Rule 105.2.c, titled "Where More Than One Party Plans to File Summary Judgment Motions." (ECF No. 29-1, at 2). Relying on Local Rule 105.2.c, Plaintiff argues that Chase's motion should be deferred or dismissed because Chase did not signal its intention to move for summary judgment in advance. (*Id.* at 4). Here, Chase is the only party to have moved for summary judgment, and there is no indication that Plaintiff sought to file for summary judgment

as well.   Thus, the application of Local Rule 105.2.c to defer or deny Chase's motion is inapposite.

Plaintiff further argues that Chase's summary judgment motion "seems directed, at least in part, towards the legal sufficiency of the Plaintiff's amended complaint, that is, Defendant Chase has in substance filed a Rule 12(b)(6) Motion after service of its answer."   (*Id.* at 3).   In addition, Plaintiff notes, Chase "adopts and incorporates by reference . . . the arguments made by SLS in its Motion to Dismiss." (ECF No. 24-1, at 8).   Asserting that Chase is "piggybacking a Rule 12(b)(6) Motion upon its Rule 56 Motion for Summary Judgment," Plaintiff seeks that a decision on Chase's motion be deferred or denied without prejudice.   (ECF No. 29-1, at 3).   Plaintiff's contentions are unpersuasive, particularly given that Plaintiff has had an opportunity to respond to Chase's motion and submit a proper Rule 56(d) request for additional discovery.   The mere fact that SLS's motion to dismiss under Rule 12(b)(6) is pending does not justify denial of Chase's summary judgment motion.

### B.   Plaintiff's Rule 56(d) Request

Alternatively, Plaintiff requests that this court defer decision on or deny without prejudice Chase's summary judgment motion pending discovery pursuant to Rule 56(d).   (ECF No. 29, at 1).   In support, Plaintiff supplies an affidavit in which he states: "Because discovery has not begun . . . , I am unable to

present the facts essential to justifying my opposition to the Defendant Chase's Motion for Summary Judgment." (ECF No. 29-2 ¶ 2).

As a general matter, Rule 56(d) allows district courts to deny summary judgment or delay ruling on the motion until discovery has occurred if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). Summary judgment ordinarily is inappropriate if "the parties have not had an opportunity for reasonable discovery," *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011), but Rule 56(d) requests "cannot simply demand discovery for the sake of discovery." *Hamilton v. Mayor & City Council of Balt.*, 807 F.Supp.2d 331, 342 (D.Md. 2011). Courts interpreting Rule 56(d) have consistently held that a nonmovant's request may be denied if "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006) (internal quotation marks omitted); *see Poindexter v. Mercedes-Benz Credit Corp.*, No. 14-1858, 2015 WL 4081208, at *3 (4th Cir. July 7, 2015) (upholding the district court's summary judgment ruling despite the plaintiff's Rule 56(d) request because she "has not explained . . . how the information [sought

in discovery] could possibly create a genuine issue of material fact sufficient for her to survive summary judgment, or otherwise affect the court's analysis"). "In other words, a nonmovant must provide 'a reasonable basis to suggest that [the requested] discovery would reveal triable issues of fact' in order for such a request to be granted." *Agelli v. Sebelius*, No. DKC-13-497, 2014 WL 347630, at *9 (D.Md. Jan. 30, 2014) (quoting *McWay v. LaHood*, 269 F.R.D. 35, 38 (D.D.C. 2010)).

Plaintiff's Rule 56(d) affidavit seeks several forms of discovery from Chase to justify his opposition to the summary judgment motion, including: the escrow audit trail; the interest audit trail; the audit trail or log from telephone calls between Plaintiff and Chase; audio recordings and notes entered on his account; the audit trail or log of Chase's mortgage service enterprise desk for account resolution; Chase's documented business procedures for correcting escrow miscalculations; the audit trail or log for inquiries made by Equifax to Chase requesting correction of Plaintiff's credit report; the audit trail and digital signatures for Chase's adverse electronic credit reporting system(s) for Plaintiff's mortgage account; Chase's customized accounting systems used for loss mitigation; documentation of or related to the transfer of Plaintiff's loan serving to SLS; documentation in Chase's possession showing that Chase acknowledged Plaintiff's written requests for information;

Chase's business processes for reconciling financial information; and depositions of David Grace and Shannon Moss. (ECF No. 29-2 ¶¶ 6-20). Plaintiff contends that "[t]he above discovery is listed in good faith to establish the facts essential to oppose Defendant Chase's Motion for Summary Judgment and is not for the purposes of delay." (*Id.* ¶ 21). In its reply, Chase emphasizes that the issues for which Plaintiff requests "discovery have absolutely nothing whatsoever to do with creating a genuine issue as to any fact material to the Motion." (ECF No. 30, at 1).

The additional discovery sought by Plaintiff would not, by itself, create a genuine issue of material fact sufficient to defeat Chase's summary judgment motion. Although Plaintiff's case is premised upon the belief that he has made his loan payments in full and on time, evidence produced by Defendants and uncontroverted by Plaintiff shows that he went into default on May 1, 2012 and has since remained in default. Additional discovery will not change this or other material facts. Indeed, Plaintiff has failed to supply specific facts or allegations demonstrating why discovery would show otherwise. *See, e.g., Mercer v. Arc of Prince George's Cnty.*, 532 F.App'x 392, 400 (4th Cir. 2013) (upholding summary judgment for the defendant because the plaintiff's "minimal effort [to detail why discovery was necessary] is insufficient to compel denial of the [defendant's]

summary judgment motion"); *Fierce v. Burwell*, No. RWT-13-3549, 2015 WL 1505651, at *8 (D.Md. Mar. 31, 2015) (granting summary judgment for the defendant and concluding with respect to the plaintiff's Rule 56(d) request: "These are not specified reasons. Defendants have specified the facts, and provided extensive evidence in support of those facts, which they argue entitle them to summary judgment."). Here, although Plaintiff simply asserts "that the essential facts necessary to justify his opposition are in the possession of Defendant Chase," a thorough review of Plaintiff's Rule 56(d) affidavit reveals no reasonable basis to suggest that the requested discovery would reveal triable issues of fact. (ECF No. 29-1, at 4). Plaintiff cannot brandish Rule 56(d) in an attempt to cure his case, which is based ultimately on an erroneous belief. Accordingly, Plaintiff's Rule 56(d) request will be denied.

## IV. Defendant SLS's Rule 12(b)(6) Motion to Dismiss

Defendant SLS has filed duplicative motions to dismiss for failure to state a claim upon which relief can be granted. SLS's initial filing on April 16, 2014 also included motions to dismiss for improper venue under Rule 12(b)(3) and to transfer on the basis of *forum non conveniens*. (ECF No. 19). As noted above, SLS's Rule 12(b)(3) motion and its motion to transfer were denied. (*See* ECF No. 31). However, SLS's Rule 12(b)(6) motion remained under consideration. (*See id.* at 6, n.3). In

the interim, SLS again filed a motion to dismiss, renewing its Rule 12(b)(6) arguments and asserting that the court lacks *in rem* jurisdiction over the Property. (ECF No. 33). Plaintiff opposes SLS's motion on the ground that its earlier motion to dismiss remains under consideration and its Rule 12(b)(3) arguments have been decided. (ECF No. 35-1, at 2).

SLS's two filings shall be considered together because, in essence, it has filed the same motion twice.[11] In addition, to the extent SLS's motion seeks to dismiss some of Plaintiff's requested relief under Rule 12(b)(6) for lack of *in rem* jurisdiction, it will be denied.[12]

---

[11] This opinion will refer and cite to SLS's latest motion. (*See* ECF No. 33-1).

[12] In its latest motion, SLS repeats its argument that this court lacks *in rem* jurisdiction over the Property and, as a result, Plaintiff's claim for *in rem* relief must be dismissed. (ECF No. 33-1, at 13-14). Whereas this court's earlier memorandum opinion determined venue to be proper even though it may lack *in rem* jurisdiction necessary to award Plaintiff some of his requested relief (*see* ECF No. 31, at 7-15), SLS now seeks to draw a distinction, arguing that the prior opinion addressed the "issue in the context of venue, not with respect to the motion to dismiss [for failure to state a claim upon which relief can be granted]." (ECF No. 38, at 3). Just as before, however, the type of relief sought by Plaintiff need not be dismissed under Rule 12(b)(6) for lack of *in rem* jurisdiction. A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the allegations set forth in the complaint and is concerned with Plaintiff's claims, not prospective relief. Furthermore, "[t]he part of Plaintiff's requested relief that directly affects the Property – an injunction and a constructive trust – is de minimis and if it cannot be granted, it will be Plaintiff's

A.   **Standard of Review Under Rule 12(b)(6)**

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cnty.*

---

loss, not Defendants'." (ECF No. 31, at 11 (footnote omitted) (citation omitted)).

*Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).  Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events.  *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)).  Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.*  Furthermore, the court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

A court reviewing a motion to dismiss pursuant to Rule 12(b)(6) generally may not consider extrinsic evidence. However, "the court may properly consider documents 'attached or incorporated into the complaint,' as well as documents attached to the defense motion, 'so long as they are integral to the

44

complaint and authentic.'" *Parrotte v. Lionetti Associates, LLC*, No. ELH-13-2660, 2014 WL 1379790, at *3 (D.Md. Apr. 7, 2014) (quoting *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see HQM, Ltd. v. Hatfield*, 71 F.Supp.2d 500, 502 (D.Md. 1999) ("The [United States Court of Appeals for the] Fourth Circuit and courts in this district have recognized an exception for written documents referred to in the complaint and relied upon by the plaintiff in bringing the civil action."). "An integral document is a document that by its very existence, and not the mere information it contains, gives rise to the legal rights asserted.   In addition to integral and authentic exhibits, on a 12(b)(6) motion the court may properly take judicial notice of matters of public record." *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp.2d 602, 611 (D.Md. 2011) (citations and internal quotation marks omitted).   Here, Plaintiff attached to his initial complaint copies of the DOT and the Note.   (ECF Nos. 1-1; 1-2).   Given that these documents are central to Plaintiff's amended complaint and attached to SLS's motions, the undersigned will consider them in resolving the pending motion.

In addition, although courts generally should hold *pro se* pleadings "to less stringent standards than formal pleadings drafted by lawyers," they may nevertheless dismiss complaints that lack a cognizable legal theory or fail to allege sufficient

facts under a cognizable legal theory. *Haines v. Kerner*, 404
U.S. 519, 520 (1972); *Turner v. Kight*, 192 F.Supp.2d 391, 398
(D.Md. 2002), *aff'd*, 121 F.App'x. 9 (4th Cir. 2005).

### B. Analysis

### 1. RESPA

In Counts 1-12 of his amended complaint, Plaintiff asserts
that Defendants collectively violated RESPA.   12 U.S.C. §
2605(e).   In Counts 1-4, Plaintiff argues that Defendants failed
timely to acknowledge receipt of his QWRs.   In Counts 5-8, he
asserts that Defendants failed to investigate and respond
properly to his QWRs.   Counts 9-12 contain Plaintiff's claims
that Defendants continued to report adverse credit information
after receipt of his QWRs.   Plaintiff's amended complaint
suggests that two written transmissions to SLS might constitute
QWRs: a July 1, 2013 fax (ECF No. 18 ¶ 143) and an August 21,
2013 letter (*Id.* ¶ 147).   In its motions to dismiss, SLS does
not challenge whether either communication satisfies the
statutory requirements of a QWR.

RESPA requires that servicers of a "federally related
mortgage loan" take certain actions and provide certain written
responses within specified periods of time after receiving a QWR
from a borrower.   According to § 2605(e)(1)(A): "If any servicer
of a federally related mortgage loan receives a qualified
written request from the borrower . . . for information relating

to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days (excluding legal public holidays, Saturdays, and Sundays)."[13]  Within 60 days from receipt of the QWR (excluding Saturdays, Sundays, and holidays), the loan servicer shall:

> (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
>
> (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--
>
>> (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

---

[13] The Dodd–Frank Wall Street Reform and Consumer Protection Act amended RESPA to reduce the time period to acknowledge receipt of a QWR from twenty (20) days to five (5) days.  It also reduced the time period during which a servicer had to investigate and respond from sixty (60) days to thirty (30) days, with an additional fifteen (15) day extension possible if, before the end of the thirty day period, the servicer notifies the borrower of the extension and the reasons for delay in responding.  Pub.L. 111–203 § 1463(c)(2), (3), 124 Stat. 1376, 2184 (2010); *see Cezair v. JPMorgan Chase Bank, N.A.*, No. DKC-13-2928, 2014 WL 4295048, at *7 n.8 (D.Md. Aug. 29, 2014). These modifications went into effect on January 10, 2014, when the implementing regulations took effect.  12 C.F.R. § 1024, *et seq.*; Pub.L. 111–203 § 1400(c)(2), 124 Stat. 1376, 2136; *see Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1145 n.3 (10th Cir. 2013).  Here, the last alleged QWR is dated August 21, 2013, before the new time periods under RESPA became effective.

> > (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or
>
> > (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes —
>
> > > (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
>
> > > (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

*Id.* § 2605(e)(2). Furthermore, during the 60-day period following a servicer's receipt of a QWR "relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or [QWR], to any consumer reporting agency." *Id.* § 2605(e)(3).

### a. Failure to Acknowledge

Challenging liability under RESPA for failure to acknowledge, SLS argues that Plaintiff does not allege "when either purported QWR was received by SLS," and "[a]bsent an allegation as to when either correspondence was received, there can be no RESPA liability." (ECF No. 33-1, at 6-7). Plaintiff attempts to rebut SLS's arguments in an earlier opposition

motion (ECF No. 22, at 7-9), which he incorporates by reference into his most recent opposition (ECF No. 35-1, at 2).   There, Plaintiff asserts that he "is not required to plead the actual dates the QWRs were received by Defendant SLS as that would not be within his personal knowledge.   If Defendant SLS did not receive the QWRs in the ordinary course of business, SLS should raise that in its answer." (ECF No. 22-1, at 7).

SLS cannot succeed on its motion to dismiss simply by arguing that Plaintiff failed to allege when his purported QWRs were received by SLS. *See Kapsis v. Am. Home Mortgage Servicing Inc.*, 923 F.Supp.2d 430, 446 (E.D.N.Y. 2013) (treating as QWRs those communications listed in the amended complaint and determining that the defendant loan servicer's duty to respond under RESPA was triggered when the "plaintiff indicates when the letter was sent, to whom it was sent, why it was sent, and a summary of the request contained therein"); *Henok v. Chase Home Fin., LLC*, 915 F.Supp.2d 109, 119 (D.D.C. 2013) (determining that the plaintiff's allegation that he sent letters to defendant mortgagee stated a claim under § 2605(e)(1) for failure to respond). *Compare McCray v. Bank of Am., Corp.*, No. ELH-14-02446, 2015 WL 3487750, at *9 (D.Md. June 1, 2015) ("Taking as true the allegation that [the plaintiff] sent the letter . . . , it is clear that the correspondence identified the plaintiff and her loan/account number, was sent to

defendant, and identified sufficiently specific concerns to enable defendant to investigate those concerns and to respond."), *with Blanchard v. Northway Bank*, No. 13-CV-119, 2013 WL 1775460, at *2 (D.N.H. Apr. 25, 2013) (noting that a RESPA claim that failed to "attach the alleged QWR" or provide "any factual allegations describing [the QWR's] contents" would be insufficient to state a claim for relief), *and Moore v. U.S. Bank, N.A.*, No. 1:12-CV-1087, 2013 WL 1500594, at *3 (W.D.Mich. Apr. 10, 2013) (dismissing a RESPA claim where the plaintiff had "presented no facts showing that he made a QWR, besides his conclusory allegation").

Here, Plaintiff pleads facts in his amended complaint sufficient to allege that his July 1 fax and August 21 letter contained information concerning "the name and account of the borrower" and "reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B); (*see* ECF No. 18 ¶¶ 143, 147). He alleges that, in his July 1 fax, he included "proof of payment for the past 20 months to show that the account paid on time and no escrow shortage through this month, and . . . requesting recalculation of the escrow so that the mortgage loan could be taken out of default." (ECF No. 18 ¶ 143). Plaintiff further alleges that, after he sent another

letter to SLS on August 21, SLS responded on September 6, 2013. According to him, SLS's response stated that: Plaintiff's July 1 fax was not a QWR[14]; there were no missing payments from Plaintiff; Plaintiff was in default based on escrow analysis conducted by Chase; and SLS could not correct Plaintiff's credit report. (*Id.* ¶ 148). Plaintiff's allegations are sufficient to suggest that SLS responded to his July 1 fax on September 6, outside of the 20-day window RESPA established in which servicers must provide a "written response acknowledging receipt of the correspondence." 12 U.S.C. § 2605(e)(1)(A).[15] Furthermore, although there is no indication that SLS's September 6 response expressly acknowledged Plaintiff's August 21 letter, it did apparently respond to the content of Plaintiff's complaint. Plaintiff does not articulate that his July 1 fax and August 21 letter differed materially in substance. (*See* ECF No. 18 ¶¶ 143, 147). Accordingly, subsumed within SLS's September 6 response is an acknowledgment of

---

[14] Although SLS's September 6 letter apparently disputed whether Plaintiff's July 1 fax constituted a QWR, SLS does not raise this argument in its motions to dismiss. (*See* ECF No. 18 ¶ 148 ("In [its September 6 letter], Defendant SLS stated . . . that [Plaintiff's July 1 fax] was not a 'qualified written request' under RESPA.")).

[15] Plaintiff, in Counts 1-4 of his amended complaint, misstates the length of the statutory window. (ECF No. 18, at 17). As explained above, defendant loan servicers had 20 days during which to acknowledge a QWR before The Dodd-Frank Act's changes to RESPA took effect.

receipt of Plaintiff's August 21 letter; Plaintiff may not succeed on his RESPA claims by elevating form over substance.

Plaintiff thus pleads facts sufficient to allege that his July 1 fax went unacknowledged by SLS during the 20-day statutory window established by RESPA. As against SLS, a single count under § 2605(e)(1)(A) concerning Plaintiff's July 1 fax will remain. Plaintiff's RESPA acknowledgment count against SLS with respect to his August 21 letter will be dismissed.

### b. Failure to Investigate

Plaintiff also contends that SLS failed to investigate and respond properly to his RESPA QWRs within 60 days, as required by § 2605(e)(2).[16] Although Plaintiff asserts that SLS did not conduct a reasonable or independent investigation (ECF No. 18 ¶ 151), he concedes that SLS's September 6 letter stated that, *inter alia*: there were no missing payments from Plaintiff; Plaintiff was in default based on escrow analysis conducted by Chase; and SLS could not correct Plaintiff's credit report. (*Id.* ¶ 148). SLS contends that "[t]his type of response is precisely what is contemplated by [RESPA], which requires a servicer to state the reasons that the account has been

---

[16] Once again, in Counts 5-8 of his amended complaint, Plaintiff misstates the timing requirement established by RESPA and in effect at the time of the relevant events. (*See* ECF No. 18, at 17-18). At the relevant time, the statutory time period was 60 days, not 20 days.

determined correct and provide the name and telephone number of the department that could assist the Plaintiff." (ECF No. 33-1, at 7). In addition, Plaintiff's assertion that SLS failed to refer Plaintiff "to an individual or office or department . . . who can provide assistance to the borrower" is belied by his admission that SLS's letter referred Plaintiff "to the 'Customer Care' number." (ECF No. 18 ¶ 149). Plaintiff asserts that the "Customer Care" number connects him to "the debt collection department, which lacks the authority and/or the information to reconcile his account and remove it from default status." (*Id.*). Plaintiff, however, demands more than what RESPA requires; that Plaintiff did not want to speak with SLS's debt collection employees is immaterial.

The version of RESPA in effect at the time Plaintiff submitted his alleged QWRs to SLS required loan servicers to respond within 60 days (excluding legal public holidays, Saturdays, and Sundays) after receipt of the QWR by providing specific information and, where appropriate, taking action. 12 U.S.C. § 2605(e)(2). Plaintiff sent his purported QWRs to SLS on July 1 and August 21, and SLS responded on September 6. (ECF No. 18 ¶¶ 143, 147, 149). Excluding weekends and public holidays, as directed by the statute, SLS's response fell within the 60-day period provided by RESPA for each of Plaintiff's alleged QWRs. *Cf. Hacker v. Deutsche Bank Nat. Trust Co.*, No.

SACV 12-1017-DOC, 2015 WL 685595, at *4 (C.D.Cal. Feb. 17, 2015).  In fact, using the calculation method as provided in the statute, SLS responded within 50 days of Plaintiff's July 1 fax. SLS's September 6 letter provided Plaintiff with a written response explaining why "the servicer believes the account of the borrower is correct as determined by the servicer" and providing contact information of SLS employees who can offer further assistance.  12 U.S.C. § 2605(e)(2)(B).  Accordingly, this letter satisfies the requirements under § 2605(e)(2) as a timely response to each of Plaintiff's purported QWRs.  SLS's motion to dismiss Plaintiff's claims for failure to investigate and respond within 60 days will be granted, and Plaintiff's claims against SLS included in Counts 5-8 will be dismissed.

### c.    Failure to Cease Reporting Adverse Credit Information

Plaintiff asserts that SLS continued to report adverse information regarding the disputed payments to credit reporting agencies, in violation of § 2605(e)(3).  SLS correctly points out that "[t]here is simply no factual allegation that such reporting occurred."  (ECF No. 33-1, at 7).  Nowhere in Plaintiff's amended complaint does he allege sufficiently any point at which SLS affirmatively provided information regarding the disputed payments to credit reporting agencies, let alone within 60 days of his purported QWRs.  Thus, Plaintiff's claims

against SLS included in Counts 9-12 of the amended complaint will be dismissed.

### 2. FDCPA

In Counts 14-20 of his amended complaint, Plaintiff asserts that Defendants, as debt collectors, violated the FDCPA. 15 U.S.C. § 1692. For the FDCPA to apply, a defendant must qualify as a "debt collector," defined, in part, as a person who "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." *Id.* § 1692a(6). SLS, however, identifies two separate statutory exemptions that, it argues, remove it from the FDCPA's definition of a "debt collector" and thus relieve it of liability under the statute. (ECF No. 33-1, at 7-8).

First, SLS points to § 1692a(6)(F)(i), which exempts from the definition of "debt collector" "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement." According to SLS, "[i]t is the mortgage servicer's fiduciary obligation to the owner of the debt that" exempts SLS from liability under the statute. (ECF No. 33-1, at 8); *Ruggia v. Washington Mut. Bank* 719 F.Supp.2d 642, 648 (E.D.Va. 2010), *aff'd*, 442 F.App'x. 816 (4th Cir. 2011) (citation omitted) ("Mortgage servicing companies and trustees exercising

their fiduciary duties enjoy broad statutory exemptions from liability under the FDCPA."). Plaintiff, however, argues that *Ruggia* and other case law cited by SLS is inapposite. (ECF No. 15-1, at 10-15). In the present case, there are no allegations of a fiduciary relationship or trustee foreclosing on the DOT. *See Reynolds v. Gables Residential Servs., Inc.*, 428 F.Supp.2d 1260, 1264 (M.D.Fla. 2006) (applying the § 1692(6)(F)(i) exemption because the contract and the general relationship between a community manager and property owner gave rise to a fiduciary relationship); *Davis v. United Student Aid Funds, Inc.*, 45 F.Supp.2d 1104, 1109 (D.Kan. 1998) (determining that a guaranty agency, in pursuing the collection of a loan in default, is carrying out its role as a fiduciary, and this activity is clearly incidental to a its "bona fide fiduciary obligation"). In addition, "§ 1692a(6)(F)(i) was intended to apply to entities such as trust departments of banks and escrow companies." *Goodrow v. Friedman & MacFadyen, P.A.*, 788 F.Supp.2d 464, 470 (E.D.Va. 2011); *see also Franceschi v. Mautner-Glick Corp.*, 22 F.Supp.2d 250, 254 (S.D.N.Y. 1998) ("The legislative history of the FDCPA confirms that Congress did not intend the Act to cover companies in the business of regularly servicing outstanding debts, such as rents, for others."). There is no indication that SLS was acting as a trust department or escrow company, or was otherwise a fiduciary such that the §

1692(6)(F)(i) exemption should apply to relieve SLS of liability under the statute.   The case law on which SLS relies does not stand for the proposition that traditional mortgage servicing activities should fall within the § 1692(6)(F)(i) exemption, or that the exemption should apply to SLS.   *See Cyrilien v. Wells Fargo Bank, N.A.*, No. H-10-5018, 2012 WL 2133551, at *2 (S.D.Tex. June 11, 2012) (citations omitted) (determining that, although evidence established that Wells Fargo's collection activity was "incidental to a bona fide fiduciary obligation created by virtue of its position as a mortgage servicer," the "debt collector" exemption does not apply to a mortgage servicing company or an assignee of a debt if the debt was in default at the time it was assigned).

Second, SLS argues that § 1692a(6)(F)(iii) applies, which exempts from the definition of "debt collector" any person attempting to collect a debt owed to the extent that debt "was not in default at the time it was obtained by such person."   *See Ayres v. Ocwen Loan Servicing, LLC*, No. WDQ-13-1597, 2015 WL 5286677, at *19 (D.Md. Sept. 8, 2015) (emphasis added) (internal quotation marks omitted) ("Mortgage servicing companies are exempt from the definition of 'debt collectors' under the FDCPA only to the extent that they take action to collect debts that were *not in default at the time they acquired the debts*."). Mortgage servicers are often exempted because, at the time they

begin servicing, the loans typically are not in default. *Allen v. Bank of Am. Corp.*, No. CCB-11-33, 2011 WL 3654451, at *7 n.9 (D.Md. Aug. 18, 2011). However, "the § 1692a(6)(F)(iii) exception, which may operate to remove a loan servicer from the definition of a 'debt collector,' does not apply if the loan was in default at the time it was acquired by the servicing company, or if the servicing company treated it as such." *Shugart v. Ocwen Loan Servicing, LLC*, 747 F.Supp.2d 938, 942-43 (S.D.Ohio 2010); *see also Allen*, 2011 WL 3654451, at *7 n.9 (citations omitted) ("Where a servicer believes a loan to be in default at the time it commences servicing, however, courts have found it is not exempt from the FDCPA's definition of 'debt collector.'"). SLS cleverly argues that Plaintiff's belief that his debt was not in default should be credited, thus exempting SLS from FDCPA liability under § 1692a(6)(F)(iii). But here, Defendants Chase and SLS both treated Plaintiff's loan as in default beginning in May 2012, long before Plaintiff became an SLS customer effective June 17, 2013. In their respective motions, Defendants expressly contend that Plaintiff's debt was in default because he refused to make payments in the amounts Defendants sought. Although Plaintiff insists throughout his amended complaint that his loan was current, SLS treated the loan as in default from when it was assigned servicing rights and thus cannot claim a statutory exemption.

Neither exemption claimed by SLS applies to remove it from the FDCPA's statutory definition of a "debt collector."   SLS does not advance any alternative arguments as to why Plaintiff failed to state FDCPA claims upon which relief can be granted. As a result, SLS's motion to dismiss Plaintiff's FDCPA claims contained within Counts 14-20 will be denied.

### 3.   Defamation

Count 23 of Plaintiff's amended complaint states a common law defamation claim against SLS.   Plaintiff alleges that SLS falsely, without justification, and with reckless disregard for the truth, published to credit reporting agencies and others statements about Plaintiff that are injurious to his reputation and financially damaging.   (ECF No. 18, at 25).   In particular, Plaintiff refers to SLS's statements that he "had missed and/or was late on his mortgage payments."   (*Id.*).   Plaintiff does not identify when and to whom such statements allegedly were made by SLS.   SLS argues that Plaintiff has not alleged sufficiently that any SLS statements would have been false because Plaintiff's amended complaint does not demonstrate that he made full and timely payments as called for by Defendants.   (ECF No. 33-1, at 10-11).

Under Maryland law, a defamation plaintiff has the burden of proving the falsity of the alleged defamatory statements. *Piskor*, 277 Md. at 171; *see supra* Part II.B.6.   Plaintiff bears

the burden of demonstrating falsity and must allege facts supporting his contention that SLS's statements to third parties were untrue.  Plaintiff, however, fails to meet this burden.  In his amended complaint, his allegations reveal that he did not pay in full the monthly fees sought by Defendants.  (ECF No. 18 ¶¶ 70-71, 97-98); *see Ervin*, 2014 WL 4052895, at *6 (footnote omitted) (citation omitted) (noting that "[e]ven if there was a dispute or actual error as to the escrow analysis, however, this dispute did not justify [the borrower's] decision to pay less than the full amount owed").  This, in turn, belies his argument that SLS's alleged reports to credit reporting agencies and others, if any were made, were false and defamatory.  Thus, Plaintiff has failed to plead facts sufficient to state a defamation claim against SLS, and SLS's motion to dismiss Plaintiff's defamation claim in Count 23 will be granted.

### 4.   Tortious Interference with Economic Relations

In Count 24, Plaintiff alleges that SLS "intentionally and willfully interfered with Plaintiff's economic relations . . . through [its] defamatory statements."  (ECF No. 18, at 25).  Furthermore, Plaintiff alleges that SLS's actions "were calculated to coerce [him] to pay sums not due, to apply for refinancing and/or repackaging of his mortgage loan at an interest rate more favorable to [it], and to cause more damage to [him] in his lawful business."  (*Id.*).  Although Plaintiff

does not allege that he was discharged by his employer as a result of his blemished credit report, he does assert that his "security clearance was denied . . . based upon [his] credit report; [Plaintiff] was denied access to his job site with his new client employer." (ECF No. 18 ¶ 164). SLS contends generally that "Plaintiff has failed to allege any interference with his employment relationship." (ECF No. 33-1, at 12).

The elements of this cause of action in Maryland are discussed above. *See supra* Part II.B.7. In the context of contracts terminable at will, a cause of action for tortious interference with economic relations "pertains to prospective business relations." *Kramer v. Mayor & City Council of Balt.*, 124 Md.App. 616, 637 (1999); *see Macklin v. Robert Logan Assocs*, 334 Md. 287, 299 (1994). In addition, "[a] broader right to interfere with economic relations exists where . . . a contract terminable at will is involved." *Natural Design*, 302 Md. at 69-70. To establish tortious interference in this context, Plaintiff must "prove both a tortious intent and improper or wrongful conduct." *Macklin*, 334 Md. at 301 (citations omitted). "A plaintiff may prove tortious intent by showing that the defendant intentionally induced the breach or termination of the contract in order to harm the plaintiff or to benefit the defendant at [the plaintiff's] expense." *Id.* Similarly, for the tort "to be actionable, the improper or wrongful conduct

must induce the breach or termination of the contract." *Id.* at 301-02. Here, Plaintiff has not alleged that his employment or other contracts were terminated or breached as a result of SLS's conduct. Plaintiff asserts that his security clearance was revoked and that he was denied new opportunities through his employer, but he does include in his amended complaint any allegations that SLS induced the breach or termination of his contracts with third parties. Although it is not clear at this point whether SLS's actions were improper or wrongful, Plaintiff has nonetheless failed to state sufficiently a claim for tortious interference with economic relations. SLS's motion to dismiss Count 24 will be granted.

### 5. Unjust Enrichment

Plaintiff asserts a claim for unjust enrichment in Count 25 of his amended complaint. He argues that while SLS has been enriched by Plaintiff's mortgage payments, he has been impoverished due to Defendants' "churning his account through late fees, property management fees, and legal fees." (ECF No. 18, at 26). SLS contends that "Plaintiff goes to great lengths in [his amended complaint] to identify allegedly improper payment rejections by SLS. Plaintiff does not, however, identify any payments received or retained by SLS." (ECF No. 33-1, at 12). As explained above, Texas law governs Plaintiff's unjust enrichment claim. *See supra* Part II.B.8. In Texas,

unjust enrichment is not a separate cause of action, but rather "a general theory of recovery for an equitable action seeking restitution." *Hancock*, 635 F.Supp.2d at 560; *see Redwood Resort Props., LLC v. Holmes Co.*, 2006 WL 3531422, at *9 (N.D.Tex. Nov. 27, 2006) (citing *Doss v. Homecomings Fin. Network, Inc.*, 210 S.W.3d 706, 709 n.4 (Tex.App. 2006)) (dismissing an unjust enrichment claim and holding that it is not an independent cause of action). Accordingly, because Texas law does not afford an independent cause of action for unjust enrichment, Plaintiff cannot sustain his claim stated in Count 25.

SLS also cites to Maryland law in its motion to dismiss. Were Maryland law to govern Plaintiff's unjust enrichment claim, dismissal nonetheless would be warranted because Plaintiff's allegations do not identify any payments or items of value received and retained by SLS "under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of it[s] value." *Klein*, 117 Md.App. at 346 (citation omitted). Plaintiff failed to include in his amended complaint any allegations that SLS received and retained a benefit from Plaintiff. Tellingly, Plaintiff's amended complaint concedes that SLS informed him that it "would not accept his ACH payment," given that it believed his account was in default. (ECF No. 18 ¶ 136). Absent allegations of benefit

received from Plaintiff and retained by SLS, Plaintiff does not state a *prima facie* unjust enrichment case.

### 6.   Remaining Alleged Violations of Maryland Law

In its latest motion to dismiss, SLS asserts that Plaintiff's amended complaint "must be dismissed as to SLS, except as to Counts 26, 27 and 28," which are brought under the MCDCA, the MCPA, and the MMFPA.  (ECF No. 33, at 1). Furthermore, SLS's proposed order reveals that it expects to file an answer to Counts 26-28.  (ECF No. 33-2).  Given that SLS expressly disavows an intent to move to dismiss Counts 26-28, the claims contained within them will not be considered as to SLS.

## V.   Conclusion

For the foregoing reasons, Defendant Chase's motion for summary judgment will be granted.  Plaintiff's verified motion in response will be denied.  Defendant SLS's partial motion to dismiss will be granted in part and denied in part.  A separate order will follow.


                                    /s/
                         _____
                         DEBORAH K. CHASANOW
                         United States District Judge