IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LOUIS M. LUPO                           :

                                        :

    v.                                  :   Civil Action No. DKC 14-0475

                                        :

JPMORGAN CHASE BANK, N.A.,              :
et al.                                  :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this case is a motion for summary judgment filed by Defendant Specialized Loan Servicing, LLC ("SLS").  (ECF No. 46).  The issues have been fully briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, SLS's motion for summary judgment will be granted.

## I.  Background

### A.  Factual Background[1]

Plaintiff Louis M. Lupo ("Plaintiff") formerly owned a home located at 7908 Hunter Lane, North Richland Hills, Texas 76180 (the "Property").  On December 20, 2007, Plaintiff executed a 30-year fixed-rate promissory note (the "Note") for $173,850.00 at a 6.0% annual interest rate payable to the lender, JPMorgan

---

[1] The following facts are uncontroverted or construed in the light most favorable to Plaintiff.  More complete recitations of Plaintiff's allegations and the background of this case are set forth in the court's prior memorandum opinions.  (*See* ECF Nos. 31; 42).

Chase Bank, N.A. ("Chase"), in monthly installments of $1,551.24. The Note was secured by the Deed of Trust (the "DOT") recorded in Tarrant County, Texas. (ECF No. 46-2). The parties agree that Plaintiff made timely mortgage loan (the "Loan") payments until November 2012.

Prior to the transfer of loan servicing to SLS, Plaintiff disputed his Loan payments with Chase. According to Plaintiff, Chase "miscalculated and overcharged for escrow" on his account every year since the inception of the Loan. (ECF No. 18 ¶ 38). Plaintiff contends that Chase made an error in 2013 that he has not been able to resolve. The alleged error stemmed from an increase in Plaintiff's property taxes from 2010 to 2011, which prompted Chase to recalculate the amount that Plaintiff was required to pay into escrow. According to SLS, the increase in property taxes was accompanied by an increase in the cost of hazard insurance, causing a corresponding rise in Plaintiff's monthly obligation. (ECF No. 46-11, at 2).

Chase allegedly mailed a "Notice of Assignment, Sale, or Transfer of Servicing Rights" to Plaintiff, informing him that Chase could no longer accept payments on the Loan and that servicing of the Loan had been transferred to SLS with an effective date of June 17, 2013. (ECF No. 18 ¶ 121). At the time servicing rights were transferred to SLS, the Loan was in default. (ECF No. 46-1 ¶ 5).

SLS also notified Plaintiff of the transfer and requested that all Loan payments be sent to SLS rather than to Chase. (ECF No. 46-3). Plaintiff contends that the payment instructions provided by SLS on June 20 were illegible. (ECF No. 18 ¶¶ 131, 134). On or about June 24, Plaintiff contacted SLS by telephone to make an electronic payment. The SLS representative informed Plaintiff that the Loan was in default and it would not accept his automated clearing house ("ACH") payment. (*Id.* ¶¶ 135-36). Plaintiff explained to SLS that his mortgage loan account was current and sought an investigation. When he called thereafter, Plaintiff alleges, he was told that the investigation was ongoing. (*Id.* ¶¶ 137-40). On July 1, Plaintiff called again and learned that he could not make his monthly ACH payment because his account was in default. He was informed that, if he provided proof of prior payment, SLS would then accept his ACH payment. (*Id.* ¶¶ 141-42).

Plaintiff sent two fax transmissions to SLS on July 1 purporting to detail proof of his payment history. (ECF No. 46-4). The faxes, addressed to "Portia," contain Plaintiff's partial payment history with Chase. Plaintiff wrote on the cover sheet for each fax transmission: "Rejected [ACH] due to inaccurate payment history. Proof of Payments & ACH enclosed past 20 months." (*Id.* at 1, 3). Subsequently, on August 21,

Plaintiff sent another fax transmission, this time to SLS executives:

> This is my third "qualified written request" [("QWR")] under Section 6 of the Real Estate Settlement Procedures Act [("RESPA")]. I am writing once again [to] request account reconciliation of my mortgage, an audit trail for the amount of money claimed owed by [SLS], and repair of my erroneously damaged credit report.
>
> Although I faxed the required documents to you in June 2013[2] demonstrating that I was current in my payments, and despite my multiple telephone conversations with Customer Care and Executive Services in July, my ACH payments continue to be refused for my home mortgage.

(ECF No. 46-5, at 2). SLS responded on September 6, advising Plaintiff that his prior fax transmissions were not QWRs under RESPA. (ECF No. 46-6, at 1 ("After our review of the loan, we have confirmed that our office has not received a [QWR] prior to your letter dated August 21, 2013.")). In its correspondence, SLS also briefly summarized Plaintiff's payment history:

> The prior servicer, [Chase], responded to your concerns with a letter dated April 17, 2013. In the response, [Chase] indicates that you continued to send the same monthly payment amount of $1,501.58 after an escrow analysis statement dated February 24, 2012 reflected an increase to the monthly mortgage payment amount. The new monthly mortgage payment was increased to $2,020.80 effective May 1, 2012. As a courtesy, [Chase] applied the May and June

---

[2] Here, Plaintiff appears to reference the fax transmissions that he sent on July 1, 2013. (*See* ECF No. 46-4).

2012 payments based on the old payment amount.

A new escrow analysis statement was generated on February 4, 2013 by the prior servicer with a new mortgage payment in the amount of $1,635.67 effective May 1, 2013. Our records indicate that we are adhering to the February 4, 2013 escrow analysis statement. Please note, the account is currently due for the April 2013 payment which reflects the $2,020.80 amount as the newer analysis is effective with the May payment. If a change to the property taxes and/or home owner's insurance has occurred, please supply us with the appropriate information so that we may review this matter further.

The payments made in June and July 2013 in the amount of $1,501.58 each were transferred to SLS from the prior servicer and combined to post the April 2013 mortgage payment. This left a balance in the unapplied/suspense account in the amount of $982.36. On July 10, 2013, SLS received a stop payment confirmation for the July 2013 payment that was initially issued to [Chase]. As such the April 2013 payment was reversed and the funds remaining for the June 2013 payment were placed into the unapplied/suspense account.

At this time, the [Loan] is currently delinquent. The [Loan] is due for the April 1, 2013 payment in the amount of $2,020.80. There is a balance of $1,501.58 in the unapplied/suspense account.

We are unable to set up ACH on the [Loan] as the [Loan] is delinquent. Once the [Loan] has been brought current, please resubmit your request. We have enclosed a reinstatement quote for your convenience.

(ECF No. 46-6, at 1-2). According to SLS, Plaintiff has not made any payments on the Loan since the July 2013 payment that was transferred to SLS from Chase. Plaintiff has not made any

payments directly to SLS, nor has Plaintiff attempted to bring the Loan current. (ECF No. 46-1 ¶¶ 5-6, 11-12).

Furthermore, on July 11, SLS sent Plaintiff a "Notice of Default and Notice of Intent to Accelerate," stating that he was in default as he had failed to make full payments on the Loan. (ECF No. 46-9). On July 11 and December 31, SLS provided Plaintiff the opportunity to begin a trial mortgage modification under the Home Affordable Modification Program ("HAMP"). (ECF Nos. 46-7; 46-8). Plaintiff did not advise SLS that he had accepted either of the trial loan modification offers. (ECF No. 46-1 ¶¶ 13-16). SLS did not make any report to the credit bureaus concerning the Loan in June 2013; since then, however, it has reported to the credit bureaus on a monthly basis that the Loan was in default. (*Id.* ¶ 19).

SLS retained the services of Hughes, Watters & Askanase, L.L.P. ("HWA") to provide pre-foreclosure notice and to conduct foreclosure proceedings. On December 2, 2014, HWA sent to Plaintiff by first class mail and certified mail a "Notice of Maturity/Acceleration of Texas Recourse Loan and Enclosing Notice of Substitute Trustee's Sale" (the "Sales Notices"). (ECF Nos. 57-2; 57-3; 57-4; 57-5). Copies of the Sales Notice were also posted on the door of the Tarrant County Courthouse and filed with the Tarrant County Clerk prior to December 16, 2014. (ECF No. 57-1 ¶¶ 5-6). The Federal Home Loan Mortgage

Corporation ("Freddie Mac") purchased the Property at foreclosure auction and has since taken possession through judicial process in Tarrant County, Texas. (*See* ECF No. 46-10).

### B.   Procedural History

Plaintiff, proceeding *pro se*, filed his original complaint against Defendants Chase and SLS on February 19, 2014. (ECF No. 1).  SLS first moved to dismiss on March 13, 2014 (ECF No. 7), and Plaintiff filed his opposition (ECF No. 15).  Plaintiff subsequently filed a twenty-eight count amended complaint alleging multiple violations of RESPA, 12 U.S.C. § 2601, *et seq.;* the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.;* the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.;* and various Maryland consumer protection and mortgage fraud statutes, as well as claims for breach of contract, breach of the duty of good faith and fair dealing, defamation, tortious interference with economic relations, and unjust enrichment. (ECF No. 18, at 17-31).  Plaintiff requests declaratory relief, injunctive relief, damages, and costs. (*Id.* at 31-32).

On April 16, 2014, SLS moved to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(6) or 12(b)(3), or to transfer this action to the United States District Court for the Northern District of Texas for *forum non conveniens*. (ECF No. 19).  The court denied SLS's Rule 12(b)(3) and transfer motions but

reserved judgment on the Rule 12(b)(6) motion. (ECF No. 31, at 6 n.3).

Chase filed a motion for summary judgment (ECF No. 24), and SLS filed a renewed partial motion to dismiss Plaintiff's amended complaint (ECF No. 33). A memorandum opinion and order granted Chase's motion for summary judgment, and granted SLS's motion to dismiss under Rule 12(b)(6) in part and denied it in part. (ECF Nos. 42; 43). Remaining against SLS are one RESPA count, Counts 14-20 under the FDCPA, and Counts 26-28 alleging violations of Maryland consumer protection and mortgage fraud statutes. SLS filed its answer (ECF No. 44), and the court issued a scheduling order (ECF No. 45).

On November 3, 2015, SLS moved for summary judgment on the remaining claims. Plaintiff was provided with a *Roseboro* notice, which advised him of the pendency of the motion for summary judgment and his entitlement to respond within 17 days. (ECF No. 47); *see Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975) (holding that *pro se* plaintiffs should be advised of their right to file responsive material to a motion for summary judgment). Plaintiff responded in opposition (ECF No. 50), and SLS replied (ECF No. 57).[3] The court stayed the scheduling order

---

[3] Plaintiff filed his response in opposition on January 22, 2016, shortly after the January 20 deadline for the response period. As a result, SLS argues that "[t]he [c]ourt should

pending resolution of SLS's summary judgment motion.   (ECF Nos. 58; 60).

## II.  Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.   *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).   In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).

exercise its discretion by striking and refusing to consider Plaintiff's opposition."   (ECF No. 57, at 12).   The court declines SLS's request and will consider all briefing concerning Defendant's summary judgment motion.

The moving party bears the burden of showing that there is no genuine dispute as to any material fact.  If the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof, then there is no genuine dispute of material fact. *Celotex*, 477 U.S. at 322–23.  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an "affidavit or other evidentiary showing" demonstrating that there is a genuine issue for trial.  *See Ross v. Early*, 899 F.Supp.2d 415, 420 (D.Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).  In other words, a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted); *see Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).

"Although *pro se* litigants are to be given some latitude, the above standards apply to everyone.  Thus, as courts have recognized repeatedly, even a *pro se* plaintiff may not avoid

summary judgment by relying on bald assertions and speculative arguments." *Smith v. Vilsack*, 832 F.Supp.2d 573, 580 (D.Md. 2011) (citations omitted).

## III. Analysis

SLS argues that the statements contained in its communications were accurate and that all delinquencies, defaults, and late charges are attributable to Plaintiff's decision to not pay the full amount of the mortgage payment when due. The amount Plaintiff needed to pay into escrow rose due to a substantial increase in property taxes and a comparatively smaller increase in hazard insurance premiums. At bottom, according to SLS, the Loan fell into default when Plaintiff refused to pay the increased amount. (ECF No. 46-11, at 1).

### A. RESPA

Plaintiff asserts that SLS violated RESPA by failing to acknowledge receipt of his QWRs. *See* 12 U.S.C. § 2605(e). Congress enacted RESPA "to insure that consumers . . . are provided with greater and more timely information on the nature and costs of the settlement process" and "to effect certain changes in the settlement process for residential real estate," such as the reduction of "the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance." 12 U.S.C. §§ 2601(a), (b)(3). RESPA requires that servicers of a "federally related mortgage

loan" take certain actions and provide certain written responses within specified periods of time after receiving a QWR from a borrower.  According to § 2605(e)(1)(A): "If any servicer of a federally related mortgage loan receives a [QWR] from the borrower . . . for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within [20] days (excluding legal public holidays, Saturdays, and Sundays)."[4] Triggering certain duties under RESPA, a QWR is defined in § 2605(e)(1)(B) as:

> [A] written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--
>
>> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
>>
>> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer

---

[4] The Dodd-Frank Wall Street Reform and Consumer Protection Act amended RESPA to reduce the time period to acknowledge receipt of a QWR from twenty (20) days to five (5) days.  Pub.L. 111-203 § 1463(c)(2), (3), 124 Stat. 1376, 2184 (2010); *see Cezair v. JPMorgan Chase Bank, N.A.*, No. DKC-13-2928, 2014 WL 4295048, at *7 n.8 (D.Md. Aug. 29, 2014).  Under the implementing regulations, these modifications went into effect on January 10, 2014.  12 C.F.R. § 1024, *et seq.*; *see Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1145 n.3 (10th Cir. 2013). Here, the alleged QWR was sent on July 1, 2013, before the RESPA amendments became effective.

> regarding other information sought by the borrower.

Here, the sole remaining RESPA count concerns Plaintiff's July 1, 2013 fax transmissions. (ECF No. 42, at 45; *see* ECF No. 46-4). SLS argues that "[a]s was the case with the alleged QWRs that Plaintiff claims to have sent to Chase, Plaintiff's fax to SLS was not a QWR because it was not sent to the separate and exclusive address provided for [QWRs]." (ECF No. 46-11, at 5). In other words, according to SLS, Plaintiff's July 1 faxes do not satisfy the statutory QWR definition because "[i]nstead of sending his correspondence via mail to the designated address and department, Plaintiff sent his correspondence to someone named 'Portia' via facsimile." (*Id.* at 6).

> RESPA's implementing regulations allow (but do not require) servicers to establish a designated address for QWRs. *See* 24 C.F.R. § 3500.21(e)(1) ("By notice either included in the Notice of Transfer or separately delivered by first-class mail, postage prepaid, a servicer may establish a separate and exclusive office and address for the receipt and handling of qualified written requests."). The final rulemaking notice for the operative regulation, Regulation X, explained that if a servicer establishes a designated QWR address, "then the borrower must deliver its request to that office in order for the inquiry to be a 'qualified written request.'" Real Estate Settlement Procedures Act, Section 6, Transfer of Servicing of Mortgage Loans (Regulation X), 59 Fed.Reg. 65,442, 65,446 (Dec. 19, 1994).

13

*Roth v. CitiMortgage Inc.*, 756 F.3d 178, 181 (2ᵈ Cir. 2014).  If "a servicer complies with the notice requirements . . . for designating a QWR address, a letter sent to a different address is not a QWR, even if an employee at that address (who may not have training in RESPA compliance) in fact responds to that letter."  *Id.* at 182; *see Peters v. Bank of Am., N.A.*, No. 3:14-CV-513, 2015 WL 1259417, at *2 (E.D.Va. Mar. 18, 2015).

On June 20, 2013, SLS sent the "Notice of Assignment, Sale, or Transfer of Servicing Rights" to Plaintiff alerting him to his rights under RESPA: "A [QWR] is a written correspondence which includes you name and account number and your reasons for the request.  Writing a note on your payment coupon or envelope is not considered a [QWR]. . . .  [QWRs] must be sent to: Attn: Customer Care Support[,] P.O. Box 636005[,] Littleton, CO 80163-6005[.]"  (ECF No. 46-3, at 1).  Plaintiff does not dispute that correspondence from SLS designated a QWR address, or that he failed to use that address.  Because Plaintiff did not use the address that SLS designated for QWRs, the July 1 fax transmissions are not QWRs and do not trigger duties or liability under RESPA.  Instead, "[w]hen an alleged QWR fails to meet the requirements of RESPA and its implementing regulation, it 'amounts to nothing more than general correspondence between a borrower and servicer.'"  *Peters*, 2015 WL 1259417, at *2 (quoting *Berneike*, 708 F.3d at 1149).  Accordingly, Plaintiff

has failed to adduce evidence that SLS did not properly designate a QWR address or that he sent QWRs to the designated address. Summary judgment will be entered in favor of SLS on the remaining RESPA count.

### B.   FDCPA § 1692e (Counts 14-18)

In Counts 14-18 of the amended complaint, Plaintiff alleges that SLS made numerous false statements in violation of 15 U.S.C. § 1692e. Section 1692e "forbids the use of any false, deceptive, or misleading representation or means in debt collection and provides a non-exhaustive list of prohibited conduct." *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 135 (4th Cir. 1996). (citation and internal quotation marks omitted). Plaintiff appears to allege violations by:

> (1) The false representation or implication that the debt collector is vouched for, bonded by, or affiliated with the United States or any State, including the use of any badge, uniform, or facsimile thereof.
>
> (2) The false representation of—
>
>> (A) the character, amount, or legal status of any debt; or
>>
>> (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
>
> . . .
>
> (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to

15

be false, including the failure to
communicate that a disputed debt is
disputed.

(9) The use or distribution of any written
communication which simulates or is falsely
represented to be a document authorized,
issued, or approved by any court, official,
or agency of the United States or any State,
or which creates a false impression as to
its source, authorization, or approval.

(10) The use of any false representation or
deceptive means to collect or attempt to
collect any debt or to obtain information
concerning a consumer.

. . .

(12) The false representation or implication
that accounts have been turned over to
innocent purchasers for value.

15 U.S.C. § 1692e.

"To succeed on a FDCPA claim a plaintiff must demonstrate
that '(1) the plaintiff has been the object of collection
activity arising from consumer debt, (2) the defendant is a debt
[] collector as defined by the FDCPA, and (3) the defendant has
engaged in an act or omission prohibited by the FDCPA.'"
*Stewart v. Bierman*, 859 F.Supp.2d 754, 759 (D.Md. 2012) (quoting
*Dikun v. Streich*, 369 F.Supp.2d 781, 784-85 (E.D.Va. 2005)),
*aff'd sub nom. Lembach v. Bierman*, 528 F.App'x 297 (4th Cir.
2013). Furthermore, the United States Court of Appeals for the
Fourth Circuit has adopted the "least sophisticated debtor"
standard to determine if a § 1692e violation has occurred.

16

*Nat'l Fin. Servs.*, 98 F.3d at 135-36.   Under this standard, a false statement that would not mislead the "least sophisticated consumer" is not actionable.   The Fourth Circuit also determined that a false or misleading statement is not actionable under § 1692e unless it is material.   *Lembach*, 528 F.App'x at 302-03.

**1. Count 14**

Count 14 includes allegations that SLS violated § 1692e(2) by "repeatedly and falsely represent[ing] the amount of the debt Plaintiff owed on [the Loan]," "repeatedly and falsely represent[ing] the legal status of the debt Plaintiff owed on [the Loan] by stating that Plaintiff was in default," and "falsely claiming that it was accelerating Plaintiff's debt and that Plaintiff was in foreclosure before such acceleration and foreclosure legally occurred."   (ECF No. 18, at 20).   To bolster his allegations, Plaintiff purports to submit a declaration from Rene Fortin, CPA, "who has reviewed the figures and determined that they are incorrect and/or inconsistent."   (ECF No. 50-1, at 5).   Ms. Fortin's declaration, however, is not part of the record, and Plaintiff's Exhibit B is nothing more than a cover page labeled "Certified Public Accountant Declaration."   (*See* ECF No. 50-4).   SLS argues, "Plaintiff's claim regarding the amount owed is predicated entirely on this phantom 'Declaration.'   As that document has not been produced, his entire argument fails and the court is left only with SLS's un-

17

rebutted statements as to the proper amount owed." (ECF No. 57, at 3). Here, the evidence shows that SLS provided Plaintiff with the amount owed on the Loan, the required monthly payments, and notice of default. (*See* ECF Nos. 46-6; 46-9). Plaintiff provides no other evidence of false representations regarding the amount and legal status of his debt, and his claims cannot withstand summary judgment review.

Similarly, Plaintiff cannot maintain his claim that SLS made false representations by "claiming that it was accelerating Plaintiff's debt and that Plaintiff was in foreclosure before such acceleration and foreclosure legally occurred." (ECF No. 18, at 20). In other words, according to Plaintiff, SLS violated the FDCPA by threatening, along with the Substitute Trustees, "to accelerate the debt and foreclose . . . before they had the legal ability to do so." (ECF No. 50-1, at 6). After providing notice to Plaintiff, SLS did accelerate the Loan and initiated the foreclosure process. (*See* ECF Nos. 50-11; 46-1 ¶¶ 17, 20). Plaintiff, however, cites to no authority in support of his argument that the appointment of Substitute Trustees must occur before any notices of acceleration and foreclosure can be communicated. Quite the opposite, as "it has long been settled in Texas that when a substitute trustee signs and posts a notice prior to the substitute trustee's appointment, the subsequent post-appointment acts of the

substitute trustee have the effect of ratifying and affirming his pre-appointment acts." *Calvillo v. Carrington Mortgage Servs.*, No. 08-13-00353-CV, 2015 WL 7730992, at *3 (Tex.App. Nov. 30, 2015). Here, the appointment of the Substitute Trustees on November 21, 2014 – or, indeed, the foreclosure sale on January 6, 2015 – does not render SLS's prior communications false or fraudulent. Plaintiff supplies no evidence showing that the notices sent by SLS ran afoul of the FDCPA.

**2. Count 15**

In Count 15, Plaintiff alleges that SLS made false representations regarding HAMP, a federal program. Section 1692e(1) prohibits any "false representation or implication that the debt collector is vouched for, bonded by, or affiliated with the United States or any State, including the use of any badge, uniform, or facsimile thereof." In addition, § 1692e(9) forbids "[t]he use or distribution of any written communication which simulates or is falsely represented to be a document authorized, issued, or approved by any court, official, or agency of the United States or any State, or which creates a false impression as to its source, authorization, or approval." According to Plaintiff, SLS "falsely represented or created a false impression that its Trial Period Modification Plan was affiliated with the federal HAMP program and/or that its Trial Period Modification Plan was authorized, issued, or approved by

the United States government." (ECF No. 18 at 20-21).
Plaintiff further contends that "under the aegis of the federal
government, specifically HAMP . . . , and with the threat of
imminent foreclosure, [he] was required to reaffirm the
collateralized debt, which would strip him of his rights and
defenses in the collection and foreclosure process." (ECF No.
50-1, at 8). As evidence, Plaintiff offers two identical
letters sent by SLS - dated July 11, 2013, and December 31, 2013
- which allegedly bear government logos and convey a sense of
urgency. (ECF No. 50-1, at 7).

Plaintiff cannot identify in the record evidence that SLS
falsely represented or implied that its services were vouched
for, bonded by, or affiliated with the government. Rather, the
letters demonstrate that SLS invited Plaintiff to submit
documentation in order to determine whether he qualified for a
loss mitigation program. (ECF Nos. 46-7, at 1; 46-8, at 1). In
separate communications to Plaintiff, SLS offered proposed
modification terms to help Plaintiff avoid foreclosure. (ECF
Nos. 50-15, at 2-3; 50-24, at 2-3). In addition to explaining
the proposed Trial Period Modification Plan, SLS explicitly
advised:

> Once you start your Trial Period Plan,
> we may be able to offer you a mortgage
> modification under [HAMP] with a lower
> monthly payment. To see if you qualify, you
> must submit a complete Borrower Response

> Package.  If you have already submitted your
> Borrower Response Package, we'll evaluate
> you for a foreclosure prevention option,
> including the HAMP modification.  In the
> meantime, you are encouraged to participate
> in this Trial Period Plan for a mortgage
> modification.

(ECF Nos. 50-15, at 3; 50-24, at 3).  According to SLS, the
"letter[s] include[] the insignia of the [federal] program
because SLS participates in that program and offers, to
qualified borrowers, HAMP modifications."  (ECF No. 57, at 4).
Indeed, SLS attached to its communications with Plaintiff HAMP-
mandated loan modification application forms and invited him to
submit documentation to determine whether he qualified for a
loss mitigation program.  (*See* ECF Nos. 46-7; 46-8).  Plaintiff
fails to show that SLS made any false representations regarding
a loan modification through an SLS trial period plan or HAMP.
Accordingly, Plaintiff's claims under §§ 1692e(1) and 1692e(9)
cannot survive summary judgment.

### 3. Count 16

Plaintiff asserts in Count 16 that SLS violated §
1692e(10), which prohibits "[t]he use of any false
representation or deceptive means to collect or attempt to
collect any debt or to obtain information concerning a
consumer."  Plaintiff alleges that SLS "falsely represented that
its debt collectors were 'loss mitigation analysts'" and used
very small or illegible font in its correspondence.  (ECF No.

21

18, at 21).   He contends that "SLS clothed its debt collectors in euphemistic language to disguise their status to [] Plaintiff and deceive him into thinking he could resolve the dispute of the inaccuracy of the claimed debt with them or take any other action that one might take with a legitimate servicer."   (ECF No. 50-1, at 10).   Plaintiff, however, fails to explain how SLS violated the FDCPA by giving its employees titles such as "loss mitigation analyst" or "relationship manager."

In support of his claim, Plaintiff references two letters from SLS stating:

> In order to assist with the resolution of a
> potential or existing delinquency, we have
> assigned a Relationship Manager to your
> account.
> . . .
>      We understand that discussing this
> situation may be difficult; however, we want
> you to know that we are here to listen and
> discuss alternative options that may be
> available to assist you.  Your Relationship
> Manager will serve as your single point of
> contact and will continue working with you
> until all available home retention and non-
> foreclosure options have been exhausted.  If
> applicable, your Relationship Manager will
> also be available to assist you with
> inquiries regarding the status of
> foreclosure.

(ECF Nos. 50-12, at 2; 50-13, at 2).   Indeed, it is undisputed that SLS representatives communicated with Plaintiff about the status of his debt and any alleged inaccuracies.   SLS representatives reviewed Plaintiff's payment history under the

Loan, investigated his claim, and responded to Plaintiff. (*See* ECF No. 46-6).  Plaintiff provides no evidence and cites to no case law supporting his contention that the job titles of SLS employees constitute false representations in violation of § 1692e(10).  In short, as SLS argues, Count 16 "is not about what SLS's employees were called, but about what they would or would not do for [Plaintiff]." (ECF No. 57, at 5).

Count 16 also includes allegations that SLS ran afoul of § 1692e(10) because it "used illegible very small type (approximately 3-point font)" in its Notice of Assignment. According to Plaintiff, "[t]he extremely small font size on the payment coupon and under the heading 'Important Payment Options [Information] for Your Records' make the instructions illegible, which is a deceptive practice made to induce [] Plaintiff to call the debt collector." (ECF No. 50-1, at 11).  Essentially, Plaintiff argues that "SLS clearly used the small type font so it could solicit collection information in disguise." (*Id.*). Again, Plaintiff offers no relevant authorities to support his claim.   The text at issue here, although small, is not illegible. (*See* 50-5, at 2, 4).  The smaller text was printed below larger, bolded text reading "Payment Instructions" and "Important Payment Options Information for Your Records." Moreover, the Fourth Circuit's "least sophisticated debtor" standard "prevents liability for bizarre or idiosyncratic

interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care." *Nat'l Fin. Servs.*, 98 F.3d at 136.

Plaintiff contends that SLS also violated § 1692e(10) by "falsely represent[ing] that [he] could not make his mortgage loan payments by ACH." (ECF No. 18, at 21).[5] Both parties cite to the DOT, which contains a provision regarding "Borrower's Right to Reinstate After Acceleration":

> Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

(ECF No. 50-18, at 18). In the section titled "Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges," the DOT provides that the "Lender may return any payment or partial payment if the payment or partial payments

---

[5] In conclusory fashion, Plaintiff asserts that SLS's refusal to accept his ACH payments also violated § 1692e(12), which prohibits "[t]he false representation or implication that accounts have been turned over to innocent purchasers for value." Count 16 of the amended complaint, however, does not assert such a claim, and it will not be considered here. *See Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (noting that a plaintiff may not amend the pleading through a brief opposing summary judgment).

are insufficient to bring the Loan current." (*Id.* at 12).

Accordingly, SLS has the option under the DOT to refuse

Plaintiff's partial payments, which Chase had done previously.

(*See* ECF No. 24-6, at 2-3).   Indeed, according to Plaintiff, "I

was told by SLS that I could make payment by ACH after I made

three months of payments in the form of cashier's checks,

Western Union transfers, or other cash-like equivalents. . . .

I was also told that I could make ACH payments once I brought my

account up-to-date."   (ECF No. 50-36 ¶¶ 13, 15).   Plaintiff

provides no other evidence and cites to no authority in support

of his claim that SLS's refusal to accept his ACH payments

constituted a false, deceptive, or misleading representation.

Rather, the available evidence indicates that, under the DOT,

SLS had discretion to determine the payment method.   Summary

judgment will be entered in favor of SLS on Plaintiff's claims

in Count 16.

### 4. Count 17

In Count 17, Plaintiff claims that SLS falsely represented

that it was the servicer of the Loan.   He asserts that:

> SLS falsely represented or implied that
> Plaintiff's mortgage loan had been
> transferred, assigned, or sold for value for
> servicing, where in fact Chase had placed
> Plaintiff's mortgage loan in collections
> status and had so transferred, assigned, or
> sold the mortgage loan as a defaulted loan
> to [] SLS, which [] SLS had accepted as a
> defaulted debt.

25

(ECF No. 18, at 22).   According to Plaintiff, SLS violated §§ 1692e(10) and 1692e(12) because "[n]othing in [the Notice of Assignment] alerted [him] that SLS was pursuing what it considered a defaulted mortgage.   In fact, [the Notice of Assignment] gives the deceptive appearance that he is simply to make payments to another servicer."   (ECF No. 50-1, at 15). Plaintiff fails to offer evidence that any statement in the Notice of Assignment was false, deceptive, or misleading.   The correspondence introduced and identified SLS as the loan servicer and made no representations regarding the status of the Loan or any prospective foreclosure proceedings.   (*See* ECF No. 50-5).   Moreover, as SLS argues, the Notice of Assignment complied with the requirements established by RESPA mandating that loan servicing transferees provide notice to borrowers. *See* 12 U.S.C. § 2605(c)(3).[6]

### 5. Count 18

Plaintiff alleges in Count 18 that SLS violated § 1692e(8), which prohibits "[c]ommunicating or threatening to communicate to any person credit information which is known or which should

---

[6]   In his opposition to SLS's summary judgment motion, Plaintiff appears to argue that SLS's July 11, 2013 letter falsely stated that SLS represents another creditor.   (ECF No. 50-1, at 15).   Count 17 of the amended complaint asserts no such claim, and it will not be considered here. *See Cloaninger*, 555 F.3d at 336.

be known to be false, including the failure to communicate that a disputed debt is disputed." (ECF No. 18, at 22). Plaintiff contends that SLS: incorrectly determined and reported the amount owed on the Loan; incorrectly determined and reported Plaintiff's scheduled monthly payment amount; improperly reported that the Loan was in default in September 2013; and failed to report Plaintiff's debt as disputed to the credit bureaus. (ECF No. 50-1, at 16-17).

First, citing his January 2015 credit report, Plaintiff baldly states that SLS incorrectly "add[ed] Plaintiff's monthly payments to the total amount owed on the [Loan]." (*Id.* at 16 (citing ECF No. 50-3, at 3)). Plaintiff apparently contends that SLS incorrectly calculated the total amount due on the Loan by continually adding monthly payment amounts to the account balance. Beyond concluding that SLS calculated "wrongfully," Plaintiff offers no evidence or explanation to support his contention. (*Id.*). According to SLS, the credit report reflects monthly increases to the account balance resulting from "unpaid interest, escrows, late fees and other items that are owed by Plaintiff." (ECF No. 57, at 7). The account balance increased over time as Plaintiff failed to send SLS the scheduled payment amount; in fact, the credit report also notes that "[t]he original amount of this account was $173,850," which

is the amount Plaintiff borrowed under the Loan. (ECF No. 50-3, at 3; *see* ECF No. 50-18, at 4).

Second, Plaintiff argues that the scheduled payment amount of $2,020.00 reflected in the credit report is incorrect and should not have been added continuously to his account balance. According to Plaintiff, his "monthly payment for the dates reported could not have been the $2,020 erroneously added to his principal." (ECF No. 50-1, at 16). A review of the account balance as recorded in the credit report reveals no month-to-month increase of $2,020.00. (*See* ECF No. 50-3, at 3). Indeed, as explained above, the account balance increased each month due to "unpaid interest, escrows, late fees and other items that are owed by Plaintiff." (ECF No. 57, at 7). Furthermore, as SLS argues, the scheduled payment amount of $2,020.00 "refer[s] to the next scheduled payment – the payment due immediately following the last payment received on July 3, 2013. As SLS did not receive any payments after July 2013, it accurately reported to the credit bureaus that the . . . next payment due was for $2,020." (ECF No. 57, at 7-8). Plaintiff has adduced no evidence in support of his claim that SLS violated § 1692e(8) by communicating the information reflected in the credit report.

Third, Plaintiff asserts a § 1692e(8) violation because "SLS report[ed] his account 180 days late in September 2013 after representing that it would not report his account

delinquent for three months following the transfer of servicing rights." (ECF No. 50-1, at 16).  As a threshold matter, Plaintiff fails to argue that, in doing so, SLS reported false information to the credit bureaus.  Instead, Plaintiff appears to argue that SLS reneged on its assurance that it would hold credit reporting for three months.  It its September 6, 2013 letter, SLS informed Plaintiff:

> When a loan transfer occurs, SLS holds all credit reporting for the month in which the transfer occurs, as well as two (2) additional months to allow for the resolution of interim payment issues associated with the transfer.  As indicated above, your loan service transferred to SLS on June 20, 2013; therefore, credit reporting will exclude the months of June, July and August.

(ECF No. 50-18, at 3).  Plaintiff acknowledges that "SLS report[ed] his account 180 days late in September 2013," which accords with the course of action SLS revealed in its September 6 letter.  As SLS argues, the letter did "not state that SLS will never report the delinquencies from the first three months of loan servicing." (ECF No. 57, at 8).  Accordingly, the undisputed evidence shows that after the hold period expired, SLS began reporting Plaintiff's delinquency and payment history. Plaintiff offers no further evidence or argument in support of his claim.

Fourth, Plaintiff asserts that SLS failed to report his debt as disputed in violation of § 1692e(8). As SLS notes, the term "disputed debts" is a term of art under the FDCPA that applies when a "consumer notifies the debt collector in writing within the thirty-day period described in [§ 1692g(a)] that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor." 15 U.S.C. § 1692g(b). The 30-day period referenced in the statute commences when the debt collector provides the consumer with a written notice of the debt. Here, SLS sent a § 1692g(a) debt validation notice to Plaintiff on June 23, 2013. (*See* ECF No. 50-7). SLS informed Plaintiff that, pursuant to the FDCPA, "unless you notify [SLS] directly . . . within 30 days after receiving this notice that you dispute the validity of this debt or any portion thereof, [SLS] will assume the debt is valid," or undisputed. (*Id.* at 3). As evidence of his claim, Plaintiff submits correspondence purportedly disputing the debt owed. The letters, however, are dated between February 17-24, 2014, and were sent to SLS, Chase, HWA, and the Substitute Trustees. (*See* ECF No. 50-32). The letters Plaintiff cites as evidence of his dispute are dated February 2014, long after the 30-day statutory window for disputing the debt's validity. Moreover, Plaintiff's letters to SLS merely inform the debt collector that he intends to commence legal proceedings.

Even assuming that Plaintiff properly disputed his debt through his July 2013 communications with SLS, he offers no additional evidence to show that § 1692e(8) was violated. At summary judgment, it is Plaintiff's burden to present evidence that raises a genuine dispute of material fact. Here, Plaintiff concedes that the January 2015 credit report includes a notation: "Account previously in dispute – investigation complete, reported by data furnisher." (ECF No. 50-3, at 3). Plaintiff, however, argues that the notation "refers to the initial debt dispute with Chase" and cites as evidence an Equifax credit report from March 2013. (ECF No. 50-1, at 16 (citing ECF No. 50-34)). Citation to the March 2013 Equifax credit report – which was compiled before Chase transferred servicing rights to SLS – does not support Plaintiff's conclusion that the aforementioned dispute notation refers to Chase instead of SLS. It is merely evidence of Plaintiff's prior dispute with Chase and Chase's debt verification. Furthermore, the notation from the January 2015 credit report neither provides the date of the earlier dispute nor identifies the entity that reported the debt as disputed. Nothing in the record supports Plaintiff's claim that SLS communicated credit information without acknowledging that Plaintiff had disputed the debt. He relies only on a conclusory statement in his opposition brief – that the January 2015 credit report notation

31

regarding a prior debt dispute refers to his initial debt dispute with Chase, rather than any dispute with SLS. Accordingly, summary judgment is appropriate on all claims in Count 18.

## C.    FDCPA § 1692f (Counts 19-20)

Counts 19-20 of the amended complaint include allegations that SLS engaged in unfair or unconscionable debt collection practices in violation of § 1692f.  In Count 19, Plaintiff fails to identify the precise statutory subsections on which he bases his claims.  He alleges that:

> [SLS] unfairly and continuously reported []
> Plaintiff's mortgage debt as late, knowing
> that the negative credit reporting
> information was especially coercive to []
> Plaintiff, and [] Chase unconscionably
> transferred the debt as delinquent to its
> division or subagent, [] SLS, who
> unconscionably refused to accept Plaintiff's
> payments, in violation of 15 U.S.C. § 1692a.

(ECF No. 18, at 23).[7]  Here, as discussed above in the context of § 1692e, Plaintiff provides no evidence showing that SLS violated the FDCPA by reporting credit information.   No subsection of § 1692f limits such reporting, particularly credit reporting that has not been shown to be false or deceptive. Similarly, Plaintiff has not demonstrated that SLS's refusal to

---

[7]  Section 1692a is the FDCPA's definitional provision and does not contain statutory prohibitions.  Accordingly, Count 19 will be analyzed as asserting claims of unfair collection practices under § 1692f.

accept his ACH payments ran afoul of § 1692f. Absent evidentiary support for Plaintiff's conclusory allegations in Count 19, his claims brought under § 1692f cannot withstand SLS's summary judgment motion.

Count 20 asserts that SLS "is in the process of effecting dispossession of [the Property] without any present right to effect non-possession through a nonjudicial action, to wit, by an auction based upon claims that [] Plaintiff owes money that he does not owe on the debt." (*Id.*). A defendant violates § 1692f(6)(A) by "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property if . . . there is no present right to possession of the property claimed as collateral through an enforceable security interest." In his opposition brief, Plaintiff argues that "SLS did not give notice . . . of the foreclosure auction held on January 6, 2015." (ECF No. 50-1, at 17). However, as detailed above, SLS sent Plaintiff a "Notice of Default and Notice of Intent to Accelerate" on July 11, 2013. SLS warned, "Failure to pay the total amount due under the terms and conditions of [the DOT] by 08/13/13 [SLS] . . . will request the Trustee or Substitute Trustee to collect the amount through non-judicial foreclosure or judicial foreclosure." (ECF No. 46-9, at 1). HWA provided pre-foreclosure notice to Plaintiff by first class mail and certified mail. (*See* ECF Nos. 57-2; 57-3; 57-4; 57-5). Notice

was also posted on the door of the Tarrant County Courthouse and filed with the Tarrant County Clerk prior to December 16, 2014. (ECF No. 57-1 ¶¶ 5-6).  Here, the evidence Plaintiff offers does not raise any genuine dispute of material fact regarding the validity of the debt owed, the Loan's default, or SLS's entitlement to pursue foreclosure.  Nothing in the record supports Plaintiff's claim that SLS lacked the right to initiate foreclosure proceedings on the Property, which was claimed as collateral through the Loan.  Accordingly, summary judgment is appropriate.

### D.  Maryland Consumer Protection Statutes

Plaintiff also asserts claims against SLS under the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law § 14-201, *et seq*. (Count 26); the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13-101, *et seq*. (Count 27); and the Maryland Mortgage Fraud Protection Act ("MMFPA"), Md. Code Ann., Real Prop. § 7-401, *et seq*. (Count 28).

#### 1. MCDCA

In Count 26 of the amended complaint, Plaintiff contends that SLS violated the MCDCA by: attempting to collect a debt with knowledge that the debt was invalid or with reckless disregard as to the validity of the amount claimed to be owed; operating as a collection agency in Maryland without a license;

falsely representing an affiliation with HAMP; and "using communications that give the appearance of being authorized, issued, or approved by the United States government in order to collect a debt." (ECF No. 18, at 27).

Section 14-202(8) provides that a debt collector may not "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist." To succeed on a claim under the MCDCA, Plaintiff must establish two elements: (1) that SLS did not possess the right to collect the amount of debt sought; and (2) that SLS attempted to collect the debt knowing that they lacked the right to do so. *See Pugh v. Corelogic Credco, LLC*, No. DKC-13-1602, 2013 WL 5655705, at *4 (D.Md. Oct. 16, 2013). The key to prevailing on a claim of MCDCA is to demonstrate that the defendants "acted with knowledge as to the *invalidity* of the debt." *Bierman*, 859 F.Supp.2d at 769 (emphasis in original). In *Bierman*, at the motion to dismiss stage, the court held that the plaintiffs' MCDCA claim failed because they merely recited the statutory language in alleging that the defendants "violated the MCDCA by claiming, attempting or threatening to enforce rights with the knowledge that the right did not exist." *Id.* Here, Plaintiff similarly recites the applicable statutory

language, but fails to adduce evidence in support of his claim sufficient to raise any genuine dispute of material fact.[8]

Plaintiff also asserts that SLS made false representations regarding its affiliation with HAMP and "us[ed] communications that . . . give the appearance of being authorized, issued, or approved by the United States government in order to collect a debt when such communications were not so authorized, issued or approved." (ECF No. 18, at 27). Plaintiff's claim recites almost verbatim the statutory language of § 14-202(9) and echoes his FDCPA claim under § 1692e(10). *See supra* Part III.B.2. Beyond conclusory allegations in his amended complaint, however, Plaintiff does not offer evidence to survive SLS's summary judgment motion. SLS argues that its communications bear the HAMP insignia "because SLS participates in that program and offers, to qualified borrowers, HAMP modifications." (ECF No. 57, at 4). SLS provided Plaintiff with HAMP-mandated loan modification application forms and simply invited him to submit

---

[8]    Moreover, as noted in a prior memorandum opinion, Plaintiff cannot contest the validity of the debt amount demanded by SLS through his MCDCA claim. (ECF No. 42, at 29-30). The statute does not allow for recovery based on errors in the process or procedure of collecting legitimate, undisputed debts. *Marchese v. JPMorgan Chase Bank, N.A.*, 917 F.Supp.2d 452, 464 (D.Md. 2013). Rather, the MCDCA proscribes certain methods of debt collection; it is not a mechanism for attacking the validity of the debt itself. *Fontell v. Hassett*, 870 F.Supp.2d 395, 405 (D.Md. 2012) ("[The MCDCA] focuses on the conduct of the debt collector in attempting to collect on the debt, whether or not the debt itself is valid.").

documentation to determine whether he qualified for a loss mitigation program. (*See* ECF Nos. 46-7; 46-8). Here, as in the FDCPA context, Plaintiff has failed to submit evidence showing that SLS made false representations regarding a loan modification or sent communications in violation of § 14-202(9).

Concerning Plaintiff's remaining claim that SLS operated as a collection agency in Maryland without the required license, he provides no supporting evidence and fails even to identify relevant MCDCA subsections prohibiting the alleged conduct. In his opposition brief, Plaintiff concedes that "SLS has provided proof of its Maryland Collection Agency" license, but argues that his claim remains viable because he "searched for such license at the time of filing suit, and it did not appear in the database." (ECF No. 50-1, at 20 n.2). According to SLS, however, it "has maintained a Collection Agency license in [Maryland] continuously since January 12, 2004 . . . . SLS's license number is 3725." (ECF No. 46-1 ¶ 18).

Plaintiff's opposition brief largely restates the conclusory allegations in the amended complaint. (*See* ECF No. 50-1, at 20-21). Rather than cite to the record or relevant case law, Plaintiff asserts only that he "has introduced specific detail that shows facts material to the stated claims are in dispute." (*Id.* at 20). Accordingly, summary judgment

will be entered in favor of SLS on Plaintiff's MCDCA claims
included in Count 26.

### 2. MCPA

Plaintiff states several claims against SLS arising under
the MCPA.  Plaintiff's first claim refers to SLS's purported
violation of the MCDCA.  *See* Md. Code Ann., Com. Law § 13-
301(14)(iii) (establishing that any violation of the MCDCA is a
*per se* violation of the MCPA).  However, as discussed in the
foregoing section, summary judgment will be entered in favor of
SLS on Plaintiff's MCDCA claims.

Plaintiff's remaining MCPA claims against SLS are based on
allegations that SLS: falsely represented that its debt
collectors were "loss mitigation analysts"; used small,
illegible text in its correspondence as a means to induce
Plaintiff to contact SLS; falsely represented that Plaintiff
could not make his Loan payments by ACH; falsely represented
that Plaintiff's mortgage loan had been transferred, assigned,
or sold for value for servicing when in fact Chase placed the
loan in collections status and SLS accepted it as a defaulted
debt; and falsely represented that Plaintiff was in foreclosure
and that it would be accelerating Plaintiff's debt.  (ECF No.
18, at 28-29).  He further alleges that "Chase and SLS
intentionally or recklessly adopted internal enterprise-wide
software processes" that facilitated the above-mentioned false

representations.  (*Id*. at 29).  Here, the record is devoid of support for Plaintiff's claim that SLS used deceptive software programs or processes, and summary judgment will be entered in favor of SLS on this claim.  The remaining underlying conduct complained of in Count 27 mirrors Plaintiff's allegations against SLS under the FDCPA.  As discussed in depth above, Plaintiff adduces no evidence in support of his claims.  *See supra* Part III.B.  For the same reasons, his claims concerning SLS's alleged false representations and use of small font size cannot withstand summary judgment review.

**3. MMFPA**

Plaintiff asserts claims in Count 28 under the MMFPA, which provides that "[a] person may not commit mortgage fraud."  Md. Code Ann., Real Prop. § 7-402.  Under the statute, "mortgage fraud" is defined as:

> any action by a person made with the intent to defraud that involves:
>
> > (1) Knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;
> >
> > (2) Knowingly creating or producing a document for use during the mortgage lending process that contains a deliberate misstatement, misrepresentation, or omission with the

39

intent that the document containing the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(3) Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(4) Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1), (2), or (3) of this subsection; [or]

(5) Conspiring to violate any of the provisions of item (1), (2), (3), or (4) of this subsection[.]

*Id.* § 7-401(d). The "mortgage lending process" broadly includes the "solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan." *Id.* § 7-401(e)(2)(i). Furthermore, the MMFPA provides a private right of action "for damages incurred as a result of a violation of this subtitle." *Id.* § 7-406(a)(1).

The MMFPA does not define the terms "misrepresentation" or "omission," as used in the statute[.] But, under Maryland common law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'" *Sass v. Andrew*, 152 Md.App. 406, 432 (2003) (citation omitted). Regardless of the

40

> particular theory, the plaintiff must
> establish the elements of fraud "by clear
> and convincing evidence." *Md. Envir. Trust
> v. Gaynor*, 370 Md. 89, 97 (2002).

*Ademiluyi v. PennyMac Mortgage Inv. Trust Holdings I, LLC*, 929 F.Supp.2d 502, 530 (D.Md. 2013); *see Galante v. Ocwen Loan Servicing LLC*, No. ELH-13-1939, 2014 WL 3616354, at *28 (D.Md. July 18, 2014).

Here, Plaintiff again alleges that: "SLS knowingly claimed that Plaintiff had not tendered the payments he was required to tender when in fact he had done so"; "SLS knowingly and falsely informed Plaintiff that he had not complied with the terms of the [Loan] when he in fact had done so"; "SLS falsely misstated and demanded that Plaintiff make payments in a manner not required under the [Loan]"; and SLS "intentionally or recklessly adopted internal enterprise-wide software processes that encourage, facilitate, or assist in such unfair and deceptive trade practices." (ECF No. 18, at 31). Plaintiff's MMFPA claims, like those he asserts throughout the amended complaint, fundamentally contest the amount owed on the Loan and SLS's entitlement to restrict payment by ACH. Critically, however, and as explained above, Plaintiff has not brought forth evidence in support of his allegations. At the summary judgment stage, he may not rest on general allegations; rather, Plaintiff must offer evidence from the record, including affidavits or

41

declarations based on personal knowledge. Fed.R.Civ.P. 56(c)(4). The evidence adduced by Plaintiff raises no genuine dispute of material fact regarding validity of the Loan and SLS's prerogative under the Loan to specify manner of payment after default. Summary judgment will be entered in favor of SLS.

## IV.  Conclusion

For the foregoing reasons, SLS's motion for summary judgment will be granted. A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge